Filed 11/20/20  Boyd v. J.H. Boyd Enterprises CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| KENNETH ROBERT BOYD, Individually and as Trustee, etc., et al., Cross-complainants and Appellants. v. J.H. BOYD ENTERPRISES, INC., et al., Cross-defendants and Respondents, | F077115 (Super. Ct. No. 15CECG00915) OPINION |
| LIZBETH BOYD, Individually and as Trustee, etc., Plaintiff and Appellant, v. J.H. BOYD ENTERPRISES, INC., et al., Defendants and Respondents. | (Super. Ct. No. 14CECG03972) |

APPEAL from a judgment and order of the Superior Court of Fresno County. Alan M. Simpson, Judge.

The Law Offices of Joseph H. Boyd and Joseph H. Boyd for Cross-complainants and Appellants and for Defendants and Appellants Kenneth Robert Boyd, etc., et al.

Gilmore Magness Janisse and David M. Gilmore for Plaintiff and Appellant Lizbeth Boyd, etc., et al.

McCormick, Barstow, Sheppard, Wayte & Carruth and Scott M. Reddie for Cross-defendant and Respondent and for Defendant and Respondent J.H. Boyd Enterprises, Inc.

Whelan Law Group and Walt W. Whelan for Cross-defendants and Respondents and for Defendants and Respondents Martha Marsh, Louise Autenrieb and Robert Marsh.

-ooOoo-

Kenneth Robert Boyd (Ken) and Susan K. Boyd (Susan), individually and as trustees of The Boyd Trust dated December 23, 1999 (the Boyd Trust), and Lizbeth Boyd, individually and as trustee of the Joseph D. Boyd and Lizbeth L. Boyd Family Trust dated September 28, 2011 (Liz) (collectively, appellants), separately sued to dissolve J.H. Boyd Enterprises, Inc. (JHBE) pursuant to Corporations Code section 1800.[1]  The two actions were consolidated and a nonjury trial was held, in which the trial court found appellants failed to satisfy their burden of proving involuntary dissolution was warranted.

Ken and Susan, on the one hand, and Liz, on the other, separately appeal from the resulting judgment in favor of JHBE and members of JHBE's board of directors, Martha Marsh (Martha), Robert Marsh (Robert), and Louise Autenrieb (Louise) (collectively, the individual defendants).[2]  Appellants contend the trial court erred by failing to find they were entitled to dissolution of JHBE under section 1800, subdivision (b)(4) and (5). JHBE, joined by the individual defendants (collectively, respondents), moved to dismiss Ken and Susan's appeal on the ground the notice of appeal was untimely.  We deny respondents' motion to dismiss and, finding no merit to appellants' contentions, affirm the judgment.

---

[1]    Undesignated statutory references are to the Corporations Code.

[2]    Judgment also was entered in favor of Christine Marsh and Alice Truscott, who were named as cross-defendants in Ken and Susan's cross-complaint.  During trial, the court granted Christine and Alice's motion for judgment pursuant to Code of Civil Procedure section 631.8.  The merits of this motion are not at issue on appeal.

2.

**FACTUAL AND PROCEDURAL BACKGROUND**

J.H. Boyd (J.H.) and his first wife, Florence Elma Boyd (who passed away in 1995), had four children, Joe, Ken, Louise, and Martha, who is 17 years younger than Joe. In 1971, J.H., Elma, and Ken formed JHBE. According to its articles of incorporation, JHBE's primary purpose was to manage, develop, operate and invest in real estate properties. JHBE's business includes owning and operating farming, residential, commercial, and industrial properties in and around Kerman, and owning notes receivable. According to Ken and Susan, JHBE also was established to assist with the distribution of J.H.'s estate; this was accomplished by distributing shares to his children which they could then sell to JHBE when needed to fund their needs.

When JHBE was first formed, J.H. was the president and Ken the vice president, and they both were directors along with Elma. JHBE was authorized to issue two classes of shares of equal value—Class A common shares with voting rights and Class B common shares without voting rights. At JHBE's inception, only Class A shares were issued, with J.H. and Elma receiving all shares, making them the sole owners.

Beginning in 1972 and continuing over the years, J.H. distributed shares of Class A stock to each of his four children, although he maintained control of JHBE. In 1998, JHBE first began issuing Class B stock to J.H.'s grandchildren. By 2012, J.H. held no stock in JHBE individually; trusts of which he was a trustor, however, held JHBE stock. JHBE's shareholders are all family members or their trusts. As of July 2014, the family members held a total of 18,032 shares of Class A and Class B stock, equally divided between the two classes.

In 1978, Joe,[3] Louise, and Martha were added to the board of directors; thereafter, the composition of officers and directors changed periodically.[4] Martha's husband,

---

[3]   Liz and Joe, who married in 1997, remained married at the time of Joe's death in February 2014. She was not a director or officer of JHBE prior to Joe's death.

[4]   According to Ken, when Ken's siblings first became board members, J.H. maintained control of the business "sharewise and authoritywise," and conducted all the

Robert, became a director in 1984 and served for about 14 years. He returned to the board a second time in 2009. That same year, J.H. gave Robert 41 shares of Class A stock, which gave him a .227 percent interest in JHBE. This made Robert the only nonlineal descendant of J.H. to hold shares in JHBE. Martha and Robert never received a salary when they were officers or directors of JHBE. Louise, who became JHBE's vice president in 1991, was paid a salary from 1992 through December 2010. Louise, who worked as a schoolteacher for 25 years, retired from teaching in 2009.

In 1991, J.H. and Elma created the Joseph Haig Boyd Living Trust (JHB Trust), with J.H. as the trustee.[5] In August 2011, Martha replaced her father as trustee of the JHB Trust, which held Class A and B stock in JHBE. In 2014, Ken resigned as a director of JHBE, Martha became the president, and J.H. became the honorary chairman of the board. J.H. had macular degeneration; by 2010 or 2011 he was legally blind and needed everything read to him. J.H. passed away in March 2015, at the age of 98.

## I.      J.H.'s Mental Acuity[6]

While J.H. was sharp his entire life, the evidence showed that in his final years, he had his good days and bad days. On his good days, which occurred up until his death in March 2015, he had relatively good mental acuity. Ken testified that in August 2013, J.H. was competent to understand and execute an agreement that reduced the interest rate

business. J.H. reported to the board what had been done and sometimes gave the board members assignments. They also discussed why they were doing certain things.

[5]      The original JHB Trust divided the trust's assets on the last trustor's death equally between Joe, Louise and Martha. Ken was excluded from inheriting, with the exception that any balance due on a January 1991 promissory note between Ken and the JHB Trust would be cancelled.

[6]      Before trial, it was adjudicated, through JHBE's successful summary adjudication motion, that there was no merit to Ken and Susan's claims of elder abuse or to revoke a trust agreement based on the alleged undue influence exerted on J.H. by the individual defendants. Ken and Susan, however, insisted on presenting evidence at trial to support their claim the individual defendants' mismanagement of JHBE was part of an overall scheme or conspiracy to manipulate or unduly influence J.H. in order to enrich themselves to the detriment of the other shareholders or beneficiaries of the JHB Trust.

retroactively on a loan owed JHB Trust, and which put Ken's friend ahead of J.H. as the first trust deed holder. In March 2014, Ken stated in a letter that "[e]ven in his current state Dad is able to express his concerns to me boldly when he disagrees." A couple of weeks before his death, J.H. was mentally alert and could converse on various topics with no problem.

At trial, Ken and Susan presented the testimony of David Roberts, an expert in clinical psychology. Roberts opined, based on his review of J.H.'s medical records, that J.H. was suffering from major cognitive dysfunction during the last three years of his life, which meant he lost his ability to manage his financial affairs and would be more susceptible to undue influence than the average person. Roberts, however, never met or spoke with J.H., Martha, Robert, or Louise, and his testimony and conclusions were based on information he obtained from Ken and Ken's children.

## II.    J.H.'s Loans and Caregiving Costs

Since JHBE's inception, J.H. borrowed money from JHBE or gave JHBE money to be invested. Sometimes he used the money he borrowed to pay personal obligations.[7] Louise never asked her father why he needed to borrow money or the purpose of the loans, but he always paid interest. According to Martha, since J.H. paid interest on his loans at the current market rate, and always paid the loans back, JHBE received a benefit when J.H. borrowed money.

In 2009, JHBE began paying for J.H.'s caregivers. At that time, Ken was in charge of J.H.'s healthcare and he paid the caregivers using JHBE funds. Ken never brought the matter before the board. After J.H. was hospitalized in 2013 due to a fall, Ken put Martha in charge of J.H.'s healthcare. Martha was told J.H. would need 24-hour care once he was released from the hospital, so she hired a care agency to provide those

---

[7]    J.H. remarried in 1997, but eventually they divorced. J.H. used some of the money he borrowed to help pay the cost of his divorce and to pay personal capital gains taxes.

services. Martha, who just learned JHBE was paying for the caregivers, spoke with JHBE's certified public accountant, who told her it was not necessary to reimburse JHBE for the prior payments because they were considered a benefit to a senior officer. Notwithstanding that advice, at Martha's direction, the JHB Trust paid for J.H.'s future caregiving costs.

## III. The 2012 Transactions

In 2012, J.H. orchestrated a series of transactions involving the JHB Trust and JHBE that included (1) JHBE purchasing a $2.5 million note the Boyd Trust owed the JHB Trust, (2) amending the JHB Trust, and (3) having JHBE's shareholders enter into a buy-sell agreement that governed the transfer and sale of shares.

### A. *Purchase of the $2.5 Million Note*

In 2005, JHBE sold a 17-acre parcel of land to the JHB Trust for $100,000.[8] Two years later, the JHB Trust sold the parcel to a developer for $3,382,000. JHBE received $101,892.33 from the sale, while the JHB Trust received approximately $2.8 million. According to Ken, the tax savings to JHBE was significant enough for it to sell the property for $100,000 and, ultimately, the family members would receive more as a result of the property being transferred to the JHB Trust and then sold by the trust.

The JHB Trust's sale of the 17-acre parcel was tied to a subdivision Ken began building in phases in 2003. In 2005, an opportunity arose for Ken to sell the property that had not yet been developed. As part of the transaction, a developer agreed to purchase the JHB Trust's 17-acre parcel. The developer was going to buy the land in a series of four transactions, with the JHB Trust's parcel being last in order. After the first two parcels were sold, Ken agreed with J.H. to swap the order of the final two sales, so J.H., through the JHB Trust, could immediately receive the proceeds and profits.

---

[8] According to Martha, Ken did not disclose the sale to Martha or the other board members.

In exchange for the priority swap, Ken asked J.H. to loan him $2.5 million. In February 2007, the Boyd Trust borrowed the $2.5 million from the JHB Trust, evidenced by a note secured by a deed of trust on the final 20-acre parcel held by Ken.[9] The note accrued interest at six percent and was due and payable on September 1, 2009. The due date on the note was extended twice, and ultimately was due on September 15, 2014.

In 2012, as part of J.H.'s global planning, which included eliminating his debt to JHBE, distributing JHBE shares to his family, and enabling him to stop borrowing money from JHBE, J.H. looked into JHBE purchasing the note from the JHB Trust. J.H. consulted with the attorneys about his plan. Joe, who had experience purchasing loans, performed due diligence, which included doing a cash flow analysis and talking to Ken, who assured Joe the loan would be paid on time. Joe concluded the purchase would be beneficial for JHBE and provided a report to the board. While Martha did not know everything Joe did, he told her he felt the investment was a good one for JHBE and there would not be a cash flow problem.[10] The board also had attorneys and certified public accountants researching the matter. Martha, Louise and J.H. spoke with Ken, who assured them there was no risk to JHBE, he was worth $17 to $18 million, he was not going to default and there would be no risk. In addition, the board was aware Ken and Susan signed personal guarantees which, according to Ken, further assured the family the debt would be paid.[11]

The details of the transaction are as follows: The balance owing on the $2.5 million note was $2,585,284.70. From loans taken over the years, J.H. owed JHBE

---

**9** Apparently, the deed of trust was never recorded.

**10** Louise was not aware the property used to secure the $2.5 million note had been used to secure other loans and she did not investigate whether there were other liens on the property. Louise did not have the property appraised. Robert did not independently investigate Ken's finances; he relied on the other directors' advice on whether the note was good and collectible.

**11** The personal guarantees were later declared invalid based on a change in the law.

$813,908, which was credited against the purchase of the note.[12] JHBE executed a new $1.5 million note in favor of the JHB Trust at six percent interest, which required interest and principal payments of $20,000 per month. In addition, JHBE stopped paying J.H.'s annual salary of $120,000 and received a $271,000 discount on the $2.5 million note.

The transaction was reflected in an "Agreement for Assignment, Transfer and Satisfaction of Debt" (unnecessary capitalization omitted) between the JHB Trust and JHBE (the transfer agreement), and the $1.5 million promissory note. Martha and Louise signed both documents, which were prepared by attorney Jim Bell, in the attorney's presence on July 10, 2012. Louise signed both documents as JHBE's vice president, while Martha signed the transfer agreement as trustee of the JHB Trust. Before the note was purchased on July 10, 2012, Martha obtained an affirmative vote from everyone approving the transaction.

While Ken denied discussing JHBE's purchase of the note with any other board member before July 10, 2012, both Louise and Martha testified they spoke with him about the transaction. Louise said she met with Ken to discuss JHBE's purchase of the note, which is when Ken told her not to worry, as he was worth $18 million, and he would not default on the loan. Martha said she explained the transaction to Ken when he called her in July, though Ken denied making such a call. Louise testified she personally delivered a notice that the debt had been assigned to JHBE to Ken's office on July 10, 2012; she left the notice, which was in a sealed envelope, with Ken's secretary and asked her to give it to him, as it was very important. Ken, however, denied receiving it.

---

[12] The debt was reflected in an April 2, 2012 promissory note, that showed the JHB Trust owed JHBE $780,408. Martha signed the note as trustee of the JHB Trust and in her capacity as a Class A shareholder. The note is not included in the appellants' or respondents' appendices. Martha testified that while J.H. had other assets he could have used to pay the debt, no one asset could have paid back the $800,000, and the note was the only asset large enough to allow J.H. to transfer it and pay the debt he owed. Selling the note was the way J.H. chose to pay back his debt to JHBE as part of his estate plan to have all his debts paid off before he passed away and to give him peace of mind.

At an August 13, 2012 board meeting attended by all of the directors (J.H., Joe, Martha, Robert, Louise and Ken), Joe gave his due diligence report and everyone discussed their opinions.[13] Martha asked if everyone agreed with purchasing the note and everyone said yes. Martha read aloud a document the attorney prepared, entitled "Written Consent of the Board of Directors of J.H. Boyd Enterprises, Inc., in Lieu of Special Meeting" (unnecessary capitalization omitted), and asked if everyone agreed with it.[14] All board members voted in the affirmative. Martha circulated the consent form for the directors' signatures, stating the attorney wanted them to sign it. Everyone signed except Ken, who abstained from signing because he was related to the transaction. Martha asked Ken if he still agreed with the purchase of the note, and Ken responded, "Yes."[15] Everyone who participated in the decision was related to the transaction, as

---

[13] Ken testified that he was not aware of the board's plan to purchase the $2.5 million note until the board meeting, and he did not have the opportunity to analyze the pros and cons of the transaction, which he claimed had already been completed.

[14] The written consent stated the directors, acting pursuant to section 307, subdivision (b), were taking the following action in lieu of a meeting, effective July 10, 2012: (1) the board discussed JHB Trust's promissory note to JHBE, and that the JHB Trust was the holder of a $2.5 million promissory note made by the Boyd Trust; and (2) after much discussion, a motion was moved, seconded, and unanimously adopted that JHB Trust's promissory note be satisfied in full by the JHB Trust's transfer and assignment of the $2.5 million note to JHBE, JHBE would issue the JHB Trust a $1.5 million promissory note representing the difference between the two notes, after taking into consideration a discount of $271,376.79, and JHBE's vice president was authorized and directed to sign all documents necessary to finalize the transaction. The consent was supposed to be signed at the time the note was purchased.

[15] The minutes of the August 13, 2012, meeting state: "Sale of the personal Note in the approximate balance of $2,500,000.00 from J.H. Boyd Living Trust to the Corporation was approved by all the Board of Directors. This note was approx. discounted by $250,000.00. Kenneth R. Boyd abstained from voting because he was part of the note." Louise explained the first sentence showed Ken voted with the other directors to purchase the note. The last sentence was meant to convey that Ken abstained from signing the consent form.

9.

they all were Class A shareholders and directors, and, except for Robert, were beneficiaries of the JHB Trust.

According to Martha, this was a good investment for JHBE. In addition, it was good for J.H. because it eliminated his debt and provided monthly income to meet his needs. In a March 2014 letter to all the family members, Ken wrote he was "paying the loans back as per our agreements," which had given J.H. or JHBE over $900,000 in profits. He further stated with respect to the $2.5 million loan: "The funds are a loan, not a gift[,] and should be viewed by the corporation as investments earning interest and increasing the bottom line, currently by over $900,000." At trial, Ken, who had not yet paid the debt, conceded he owed the debt and said he would pay it. He thought the loan was a good one because he "fully intended to pay it and I always intended to pay it once I can work out the circumstances."

### B. The Buy-Sell Agreement

In 2012, J.H. planned to gift JHBE shares to his family members. To effect this gift, J.H. retained Stoughton Davidson Accountancy Corporation to appraise the JHBE stock. Stoughton Davidson appraised the stock at about $234 per share as of December 31, 2011.

At the same time, J.H. proposed amending the bylaws governing the transfer of shares. Article XII of JHBE's original bylaws on the transfer of shares provided that if a shareholder wanted to sell or transfer any JHBE shares, the shareholder had to provide written notice to JHBE's secretary, who would deliver the notice to the other shareholders, who had the right of first refusal to purchase the shares at the price and terms set by the seller. If the other shareholders did not purchase all of the shares, the seller could sell them to any person, but not at a lower price or on more favorable terms than offered the other shareholders. J.H. had gifted shares multiple times to his children without bringing the matter before the board for approval.

10.

The board considered amending article XII, but JHBE's corporate attorney, Jim Bell,[16] advised it would be better to change the procedure for transferring shares through a buy-sell agreement. Eventually the board agreed, and Bell drafted a buy-sell agreement that would control future JHBE share transfers.

The buy-sell agreement governs those shareholders who sign it. The stated purpose of the buy-sell agreement is: (1) "to ensure that the Corporation's shares remain closely held to protect the Corporation's management and control from persons not acceptable to all Shareholders"; and (2) "to provide a ready market for the Corporation's shares in the event that the Shareholders wish to sell their shares rather than hold or transfer them through a permitted transfer."

The buy-sell agreement makes it simple for shareholders to transfer shares to family members without having to go through the sale procedures set forth in the buy-sell agreement. The agreement allows each shareholder to transfer his or her shares to: (1) the shareholder's issue; (2) the shareholder's parent who is a direct lineal descendant of J.H. and Elma: (3) JHBE; or (4) a revocable or irrevocable trust of which the trustee is either a direct lineal descendant of J.H and Elma, or the spouse of a direct lineal descendant.

To the extent a shareholder wants to sell shares, JHBE has the right of first refusal. If JHBE does not exercise this right, the other shareholders may purchase the shares at the asking price. If the other shareholders decline, the shares may be offered to third parties at a price no lower or terms more favorable than offered JHBE and the other shareholders. In addition, the board "shall, at the annual meeting, determine the value of the Corporate shares for the purpose of establishing a maximum sales price per share." The share value, which is the maximum price per share that a shareholder may ask for

---

[16] Consistent with J.H.'s practice of having one attorney represent JHBE, the JHB Trust, and J.H. individually, Bell was also acting as J.H.'s personal attorney and the attorney for the JHB Trust. According to Louise, everyone in the family knew of this practice.

when selling his or her shares, "shall be established using" a formula that is based on the fair market value of JHBE's assets, as determined by the board, less JHBE's total liabilities and the built-in gains tax. JHBE's board believed it must make a good faith effort to calculate the fair market value when valuing the shares.

After Bell prepared the buy-sell agreement, J.H. signed it and it was sent to the shareholders to be reviewed and signed. J.H. told his four children he would give them additional JHBE shares if they signed the agreement. Martha, Robert, Louise, and their children all readily signed it.

On November 3, 2012, Joe and Liz met with J.H. and Louise about the buy-sell agreement. According to Louise, J.H. told Joe and Liz if they signed the agreement, he would gift them 943 shares of Class A stock and 104 shares of Class B stock. After some discussion, with J.H. answering Joe and Liz's questions, Joe and Liz signed the agreement. Joe and Liz never said they did not want to sign it. Louise then signed the new share certificates, which were in Joe's name, and gave them to him. Neither Joe nor Liz objected to receiving the shares in Joe's name. Joe, however, asked J.H. if he could transfer the shares to a trust; J.H. said he could and told him to take the share certificates to the corporate attorney to have them transferred. At no time did J.H. threaten to disinherit Joe if he did not sign the buy-sell agreement or say words to the effect "[s]ign the agreement or go to hell." J.H. never raised his voice in anger when speaking to Joe and Liz; he acted in a gentlemanly manner during the entire meeting. About nine days later, Joe had the shares transferred to the Joseph and Lizbeth Boyd 2001 Family Trust.

Liz's testimony about the meeting contrasted completely with Louise's testimony. Liz testified that when the parties met, J.H. immediately said they were only there to sign the buy-sell agreement "or the hell with you and I will give your stock to the other kids." Liz claimed she and Joe pleaded with J.H. for about 15 or 20 minutes that they did not want to sign, but at the end of their pleading, J.H. said "[s]ign it or else." Liz said she told Joe it was his decision, as it was his inheritance, and Joe decided to sign it. Liz also

12.

claimed the stocks that were gifted to Joe were to go into their living trust, while the stocks from J.H.'s trust were to go into the inheritance bypass trust, but that did not happen and it was never corrected.[17]  When Joe pointed this out after signing the agreement, J.H. responded that Joe should have said something and it was too late.

Ken refused to sign the buy-sell agreement, in part because he objected to the board being able to determine the fair market value of JHBE's assets on its own, without the assistance of an appraiser.[18]  This was not the first time Ken was at odds with his father.  Martha was aware of occasions when J.H. disinherited Ken.

### C.     The JHB Trust is Amended and an Irrevocable Trust Created

In July 2012, on the same day Martha and Louise signed the documents concerning JHBE's purchase of the $2.5 million loan, J.H. amended the JHB Trust to provide that Ken would not be entitled to receive his share of the trust unless all the debts he, Susan, or the Boyd Trust, owed J.H., the JHB Trust, and JHBE were paid by May 15, 2018.[19]  If not timely paid, Ken's share would be distributed in three equal shares to Martha and the inheritance trusts for Louise and Joe.

---

[17]     In a March 2014 letter to Martha, Liz stated that both classes of stock should have been issued in the name of the inheritance trust.

[18]     At some point, Ken sent Martha an email that discussed his problems with the buy-sell agreement, to which Martha responded by email.  Martha forwarded Ken's email to all the Class A shareholders and assumed they would discuss the issue with their children, who were the Class B shareholders.  The email exchange was entered into evidence as a trial exhibit, but the parties did not include it in their appendices.

[19]     This was not the first time the JHB Trust was amended.  The first amendment, in 2009, was prepared by Ken's son, attorney Joseph Boyd; it divided the trust assets equally between Ken's trust, Louise's trust, Martha, and Joe, and gave Ken a springing power of attorney, but it did not mention the $2.5 million loan.  J.H. subsequently retained attorney Bell and revoked the springing power of attorney.  Bell prepared the second amendment, effective August 2011, which reduced Ken's share of the trust on J.H.'s death by any indebtedness Ken, or any entity owned by Ken or Susan, still owed J.H. or the JHB Trust, and named Martha as trustee.

13.

J.H. also created an irrevocable trust, into which he placed the stock he gifted Ken, which would be distributed to him if the debts he, Susan, or the Boyd Trust owed J.H., the JHBE Trust, and JHBE were paid by May 15, 2018 (the JHB Irrevocable Trust). If not timely paid, the trust estate would be divided equally between Joe, Louise and Martha. If any of these three predeceased J.H., his or her share would be distributed to his or her living issue, by right of representation.[20] Martha was named trustee of the JHB Irrevocable Trust.

Ken, Liz, and Louise all testified they did not know the JHB Irrevocable Trust had been created when JHBE purchased the $2.5 million note in 2012, and Liz said Joe was not informed either. Martha, however, testified she sent Ken a copy of the irrevocable trust shortly after it was put into place.

## IV. JHBE's Investments

### A. The Sran Loan

In 2009, JHBE sold 80 acres to Sukhjit Sran. As part of the sale, JHBE loaned Sran $740,000 at six and one-half percent interest, payable in annual installments of $60,000, with the unpaid balance due in full on January 1, 2014.[21] The promissory note contained a provision that stated Sran intended to refinance the loan when the balloon payment was due. If he was unable to obtain a loan large enough to pay off JHBE's loan, JHBE agreed to subordinate to a first deed of trust on the refinanced loan as long as the face amount of the refinanced loan was delivered to JHBE to reduce the balance on the current note and Sran paid JHBE $60,000. JHBE then would amortize the balance of the loan over five years at a rate of seven and one-half percent.

---

[20] Since Joe predeceased J.H., his share would go to his son, Joseph F. Boyd. In July 2014, the JHB Trust was amended to provide that the trust assets would be divided equally between Ken, Louise, Martha, and Joe's son. If J.H. died before May 16, 2018, Ken's share would be distributed to the trustee of the JHB Irrevocable Trust, and administered in accordance with its terms.

[21] Martha testified the sale was not disclosed in a board meeting, or to herself, prior to the sale.

14.

According to Martha, around the time the balloon payment was due, Ken told her that while Sran had the final payment, he was wondering if JHBE would loan the money back out at six percent interest. Martha said no because the interest rate was too close to the variable rates JHBE was paying. Martha consulted with J.H., who agreed with her decision. They wanted to preserve JHBE's liquidity and J.H. was concerned about the large debt Ken owed JHBE. Sran paid off the $309,000 balance on the loan and JHBE used those funds to pay down its debts, some of which were accruing interest at six percent.

Ken testified Sran was going to pay interest on the new loan at seven and one-half percent interest, which would have generated about $86,000 in income for JHBE, but Martha denied Ken mentioned that interest rate. Throughout the current litigation, Ken changed his estimate of the loss JHBE incurred from not extending the loan—it went from $16,000, to $86,197, and finally to $145,000. Ken also claimed the decision to reject the extension required board approval because it involved a transaction over $100,000. While the board discussed placing such a restriction on transactions, however, the proposal did not pass.

### B.     The Sale of the Vineland Property

JHBE owned a .4-acre rural lot on Vineland Avenue that had a home on it. Several people had been living in the home, but they moved out after the well on the property went dry. J.H., Louise and Martha discussed whether JHBE should sell the property.

Martha and J.H discussed replacing the well, which would cost $13,000, but the property was so dilapidated that putting money into it was not a good choice. While J.H. suggested refurbishing the house, which would cost about $20,000, Ken thought that was too much to spend on a dilapidated house and "it would be almost impossible to get a return on our investment in 15 years" if the house were rented out. Although the house appraised at $61,000 in 2012, the entire JHBE board, including Ken, agreed the house's

value in its present state was $6,580. That was a compromise value between J.H.'s value of $6,500 and Ken's of $7,000.

After considering the options and noting the going rate for land in the area was about $24,000 per acre, in October 2014, J.H., Martha, and Louise decided to sell the property to the neighboring property owner, George Holland, for $12,000.[22] J.H., who was an experienced real estate broker, handled the negotiations with Holland. The sale included an agreement that, in the event either Holland's or JHBE's pumping systems defaulted, the other would allow the use of their pump while repairs were made on the defaulted system. This allowed JHBE to obtain water from Holland's recently dug $250,000 deep-water well. In addition, JHBE did not have to pay most of the typical closing costs.

### C. The Pass-Through Loan

In May 2008, JHBE borrowed $2 million from Wells Fargo and then lent that money to the Boyd Trust as a pass-through loan; that is, the Boyd Trust would make the payments to JHBE, which would in turn pay Wells Fargo. The Wells Fargo loan was secured by an apartment complex on El Mar Lane that JHBE owned. Ken used the same property he pledged to J.H. for the $2.5 million loan as collateral for the pass-through loan; the deed of trust was recorded. Ken testified he obtained permission from the other JHBE directors before going forward with this transaction.[23] Louise testified she signed the Wells Fargo promissory note because J.H. told her to do so.

---

[22] At trial, Brian Ellsworth, Ken's son-in-law who had worked for Ken as a broker for 20 years, testified the property was worth about $150,000 if it was properly repaired and able to be sold. Ellsworth, however, had never seen the house because it was demolished by the time he performed his valuation. The trial court found Ellsworth's testimony was not credible.

[23] The minutes of the August 11, 2008 board meeting state that JHBE borrowed $2 million from Wells Fargo and loaned the same amount with the same terms to Ken, and prior to executing the loan, each director was notified of this. The minutes further state: "Wells Fargo Bank had a stipulation that Kenneth R. Boyd was to manage the Corporation upon the resignation of J.H. Boyd."

In 2009, the pass-through loan was subordinated to $1 million that Ken, through the Boyd Trust, borrowed from Bank of The Sierra, which used as collateral the same property pledged for the $2.5 million loan and pass-through loan. Ken did not get the subordination agreement ratified by the board of directors, and J.H. did not tell Martha about the agreement.

### D. The El Mar Apartments

JHBE owns an apartment building with 43 units known as the El Mar Apartments, along with two fourplexes located next door. The apartments are in good condition; they are fully rented and there is a waiting list. Gross rental income increased each year from 2014 to 2016. Net income dropped slightly in 2016 because of increased expenses, as JHBE decided to start replacing the 50-year-old fencing on the property. No evidence was presented that rental rates were below the fair rental market rate in Kerman.

The $2 million Wells Fargo loan secured by the apartments has a provision stating that, to avoid default on the loan, Ken must maintain active management of the apartments upon J.H.'s death. After J.H.'s death, Martha received written notice that the loan was in default due to his death. Martha spoke with Wells Fargo and told them Ken was no longer part of JHBE, other than owning some shares, and Wells Fargo said that was not a problem. Martha communicated with Wells Fargo annually and there had never been a problem. JHBE had been making consistent payments on the loan.

### E. The Vineyards

JHBE owns industrial and commercial buildings. Since Martha became president in 2014, net income increased each year on the industrial building and the commercial building's net income remained stable.

JHBE also owns two farms—one is 100 acres and the other is 27 acres. The farms were planted to vineyards, which historically J.H. and Ken managed together. In 2009, Ken was nominated to serve on the board of directors of Rotary International, which would not have given him time to continue helping J.H. with the farms. Concerned that

J.H. could not handle them on his own, Ken suggested they lease them. J.H. agreed and the farms were leased to Dennis Wilt, who had a 40-year farming relationship with J.H. and had been providing consulting services for Ken for the past 12 years, for which he was being paid $2,000 per month.

The lease was an 80/20 crop share on the gross revenues, with J.H. receiving 20 percent and Wilt receiving 80 percent of the gross revenues, with Wilt covering the farming costs. Wilt had one good year when he profited around $120,000, but most of the time his average annual profit was $80,000. The lease initially ran through 2014, but it was extended through part of 2018.

Wilt believed it was economically reasonable to sell the vineyard grapes as raisins rather than wine grapes during his lease. Soon after the extension, however, the raisin industry began going through a price downturn and there was a drought that affected the soil. This caused a decline in the production of raisins from 2013 to 2016, and a corresponding decline in JHBE's farm revenue, which dropped from around $100,000 in 2013-2014, to $47,000 in 2016, when the industry crashed. The actual figures differed greatly from the assumed figure of three plus tons per acre used by Ken's appraiser, James Palmer, which he used to value the 27-acre parcel at $896,000 and the 100-acre parcel at $2.851 million. Due to personal health issues and the drop in price of raisins, Wilt and JHBE agreed to terminate the lease in January 2017.

Ken testified several times he brought up with the board members possibly breaking Wilt's lease and directly operating the farms and he was prepared to discuss the issue at the August 2013 board meeting. Ken believed JHBE could make a lot more money by changing the farms' operation. Ken, however, never criticized or objected to Wilt's farming practices. Ken believed the property should have generated an additional $250,000 per year for JHBE, but Wilt did not believe that was possible. Wilt considered himself to be a good farmer and it was in his own interest to do his best because then he would earn more. In hindsight, Wilt would not have done anything differently and stands

18.

by his decision to sell raisins as opposed to table grapes. Ken never sought to renegotiate Wilt's lease.

Ken testified that at one time or another he discussed with the other board members the possibility of ripping out the vineyards and planting almonds so JHBE could make more money. Such a move, however, would cost between $800,000 and $1.25 million, but with Ken defaulting on the $2.5 million note, JHBE did not have the capital to incur such an expense. Moreover, it would have been very difficult for JHBE to obtain a loan due to Ken's default and the ongoing litigation.

## V.     JHBE Determines the Fair Market Value of its Stock

At some point, Joe wanted to sell some of his JHBE stock to pay off debts and start planning for retirement. On July 8, 2013, Joe sent a notice to Louise stating he wanted to sell 200 Class B shares at the greater of $300 per share or their fair market value as established by the board at the upcoming annual meeting to be held on August 23, 2013.

The August 2013 meeting was the first time the board met to value JHBE's shares following adoption of the buy-sell agreement. J.H., Joe, Martha, Louise, Ken, and Robert were all present. J.H.'s estimated value of JHBE's assets and liabilities, which yielded a share value of $265, was sent to the board members before the meeting. Ken had his own detailed list of values. At the meeting, the board members discussed every piece of property JHBE owned and tried to value each asset to the best of their ability. By the end of the nearly four-hour meeting, all the board members, including Ken and Joe, unanimously agreed on a per share value of $277. The board authorized JHBE to pay up to $20,000 to buy back shares. This was close to a valuation performed by Joseph Mattes, JHBE's certified public accountant (CPA), who valued the shares at $267 per share as of December 31, 2013.

The next business day, Martha called JHBE's attorney, Bob Mallek, to tell him Joe wanted to sell some Class B shares. Mallek told her Joe would suffer serious tax

19.

consequences if he only sold Class B shares and, to avoid those consequences, he needed to sell Class A shares as well. Joe and Liz met with Mallek to discuss the matter. After that meeting, Joe advised JHBE he did not want to proceed with the requested sale.

Martha and Robert, however, knew Joe and Liz were having financial difficulties and wanted to help. On August 30, 2013, Martha met with Joe and Liz and offered to loan them $60,000 secured by Joe's Class A shares. Martha and Robert chose Class A shares as security because, should Joe and Liz default, the shares were more marketable due to their voting rights and would have been offered equally to the other shareholders per the buy-sell agreement. Liz, however, got angry and the discussion ended.

## VI.     The March 2014 Shareholder Meeting

A shareholder meeting was held on March 8, 2014. For the first time, the Class B shareholders, which included J.H.'s grandchildren, were invited to the meeting. Martha helped her father prepare a report to outline his goals and vision for JHBE, which included making a smooth transfer to the next generation and building a stronger asset base so JHBE would be in a better position to pay higher dividends.

Joe had passed away in February 2014 and the shareholder meeting was to take place the day after his funeral. J.H. wanted the meeting to go forward as he was excited to share his vision for JHBE and was ready to see the next generation take the reins. Everyone, including Liz, confirmed the meeting should go forward. Once the meeting began, Martha had a difficult time maintaining control, as everyone was mourning Joe's loss and Liz was very upset. There was a lot of emotion and hurt feelings, and it became very accusatory and attacking. Liz felt she was treated like she was no longer a member of the family and claimed Martha yelled at her. Louise and Robert, however, denied that Martha shouted, but they did say at one point she had to do what she could to restore order. Although J.H. wanted the meeting to continue, the board voted to adjourn.

At a May 10, 2014 board meeting, the board decided to keep the share value at $277 per share, which all of the board members, including Ken, accepted.[24] The board's practice had been to exercise good faith in determining the fair market value of JHBE shares.

## VII. Ken Resigns as Director and Attempts to Sell His Shares

On June 3, 2014, Ken resigned as director of JHBE. In a letter to Martha and Louise, Ken stated he wanted to sell his JHBE shares, including shares that had been "set aside in trust," to reduce the $1.7 million he owed JHBE on the pass-through loan, and three of his children, who signed the letter, also wanted their stock sold to reduce that debt.[25] Ken felt it was proper to have an independent appraiser establish the value of the shares. Ken further stated he would pay off the $2.5 million loan as soon as his farm sold; the escrow was expected to close in 30 days.[26]

When Martha read Ken's letter to J.H., he stated: "Ken is trying to destroy my corporation." Martha and J.H. had a previously scheduled appointment with Mallek; when they arrived at Mallek's office, Mallek read the letter, and J.H. and Mallek met privately. After that meeting, J.H. told Martha and Louise that JHBE needed to conserve money and should stop making monthly payments on the $1.5 million note it owed the JHB Trust. Mattes, the accountant, advised Martha it was fine to stop making the principal payments on the note as long as the interest payments were current by the end of each year. According to Martha, the letter triggered J.H.'s belief that Ken was not

---

[24] At that time, the board was comprised of J.H. (president and chairman of the board), Martha (executive vice president), Louise (vice president/secretary), Robert and Ken, with one director position vacant. The treasurer position also was vacant.

[25] At the time, Ken held, through the Boyd Trust, 940 Class A shares and 945 Class B shares.

[26] At trial, Ken claimed he discussed the contents of the letter with J.H. before he sent it. Ken said J.H. did not want him to resign but told Ken he was proud of him for taking a stand. In addition, Ken said J.H. thought it was fine for him to sell his shares, as that was what they always agreed to do.

21.

going to pay his debt.  About four days later, J.H. told Martha that if Ken did not pay the debt, JHBE needed to sue him.  Thereafter, JHBE stopped making principal payments on the $1.5 million note.

On June 18, 2014, Martha, on the board's behalf, responded by denying Ken's request to use JHBE shares to reduce his debt.[27]  Martha directed him to the procedures in the bylaws for selling or transferring his shares, as his shares were not subject to the buy-sell agreement and thus it was the other shareholders, not JHBE, who had the first right of purchase.  Ken never followed through on that direction or attempted to sell his shares.

## VIII.  Liz Attempts to Sell Her Shares

After Joe's death, Liz, aware that Ken and J.H. had borrowed money from JHBE, asked JHBE to loan her $100,000 because she was having financial difficulties.  Martha sent her a letter declining her request, which was not presented to the board.

Liz then offered to sell her shares.  In a May 9, 2014 letter, JHBE's attorney advised Liz's attorney that if Liz wanted to sell her shares, she needed to comply with the buy-sell agreement and the maximum sales price per share had been set at $277 at the August 23, 2013 board meeting.  In a June 5, 2014 letter, Liz's attorney responded that Liz did not believe she was bound by the buy-sell agreement; therefore, she did not need to follow its requirements or procedures.  Liz offered to sell her shares to JHBE, or any party approved by JHBE and the remaining Class A shareholders, for their fair market value as of the date of Joe's death, which would be determined by the parties or, if they could not agree, by a third party appraisal.  Liz expected payment in cash, but if the buyer wanted payment terms, she was willing to consider any reasonable proposal.

---

**27**     At that time, the board was comprised of J.H. (honorary chairman of the board), Martha (president), Louise (vice president/secretary), and Robert, with two vacant director positions.

22.

On June 17, 2014, JHBE, which was in a very cash poor situation, offered to purchase 73 of Liz's Class A shares at $277 per share, for a total payment of $20,221, and it would consider purchasing the balance of her Class A shares (1,810 shares) if Ken paid the balance owing on the $2.5 million note by its September 15, 2014, due date. Once it was established how many shares JHBE would purchase, JHBE would provide notice to the shareholders of the availability to purchase the remaining Class A or Class B shares. Liz rejected the offer because she did not agree with the $277 share value.

On August 5, 2014, Liz's attorney sent JHBE a letter stating that to settle the matter, Liz was prepared to transfer all 2,932 of her outstanding shares (1,883 Class A and 1,049 Class B) to JHBE or the other shareholders for $1 million, which equated to a share price of $341.07. The attorney stated the offer remained open for 10 days, when it would be withdrawn, and if JHBE or its shareholders were not prepared to pay the shares' actual value, Liz had no option but to commence litigation against JHBE and its directors.

The board held a special meeting on August 12, 2014, to address Liz's demand, with J.H., Martha, Louise, and Robert present. The board decided not to have JHBE purchase Liz's shares at $341.07 per share because (1) the board believed the price was inflated and the actual fair market value was $277 per share, and (2) the board needed to be sure it would collect on Ken's $2.5 million note that was due the following month, as it needed that money to purchase Liz's shares.[28] In an attempt to avoid litigation, however, it allowed Liz to market the shares to the other shareholders at $341.07 per share. The next day, JHBE sent a notice of intended sale to the shareholders as required by the buy-sell agreement, offering the shares at $341.07. The notice stated the board

---

[28]    At the time, Martha believed it was likely Ken would not pay the note when it became due, as Ken told the board on June 3, 2014, he would pay when escrow closed on the sale of an almond orchard, yet the escrow apparently had not closed, and Ken had not provided notice of any other way of paying the debt. Ken notified Martha in an August 13, 2014 letter he would not be able to pay off the loan because the orchard fell out of escrow.

held a special meeting where it "accepted an informal opinion that the value of the shares have increased and have reset the stock value to $341.07 per share." Based on the advice of JHBE's attorney, Mallek, and to satisfy the board's fiduciary obligations to the shareholders, the notice also stated a "significant note receivable" of $2.6 million was due in full on September 15, 2014, and if it was not received, JHBE's stock value would be negatively impacted. The board did not include this information to try to discourage shareholders from buying. When asked why the notice did not also indicate that litigation had been threatened, Martha responded that Mallek did not tell the board that information needed to be disclosed. No shareholder accepted the offer to purchase Liz's shares.

Martha believed that if Liz had marketed the shares at $277, she would have been able to sell them. According to Martha, there is a market for JHBE shares if they are sold at the right price. Liz's price, however, was inflated and no one was interested in purchasing the shares at a price that assumed Ken would pay his notes. If the price were discounted because of the current situation, Martha believed the shares would be purchased.

The following month, Ken defaulted on the $2.5 million note, even though he testified he had substantial assets and wealth to pay off the note when it came due, and he was worth around $17 million.

Following J.H.'s death on March 24, 2015, K.Coe Isom, Stoughton Davidson's successor, performed a professional valuation of JHBE's shares and determined the per share value was $157 as of the date of J.H.'s death.[29] Ken's default on the $2.5 million note was the reason for the share value decline. At the first board meeting held after

---

[29] K.Coe Isom valued JHBE at $2,831,019, which was the difference between assets and liabilities. In calculating assets, the appraisal discounted the $2.5 million note, while liabilities included a gains tax. To calculate the per share value under the asset approach, the appraisal divided the value of JHBE by 18,032, the total number of outstanding shares.

24.

receiving the K.Coe Isom appraisal, the board adopted the $157 per share value; the board held the value at that price at its subsequent May 2016 board meeting.

Charles Burak, a CPA who Ken called as an expert at trial, determined JHBE's share value as of September 21, 2015, was $386 per share, which assumed Ken's debt would be fully paid.[30]  Burak thought that if Ken traded in his shares to reduce his debt to JHBE at $386 per share, he would not receive a windfall and JHBE would be made whole.  Discounting the value of Ken's debt reduced the share value to $182, and if Ken did not pay his debts, the value was $149.  These prices, however, did not include the tax benefits to JHBE in discounting or writing off the note, which would increase the share value.  Burak opined a buy-sell agreement affects the marketability of stock and decreases the stock's market value.  In Burak's experience, it is more difficult to find an outside unrelated buyer of shares in a closely held family corporation.

Burak testified JHBE's profitability was significantly lower than expected for a company with assets the size and value of JHBE's.  Burak opined JHBE's two percent profitability did not meet industry standards.  In his valuation, Burak assumed a return expectation of 19 percent and he believed the rate of return for individual pieces of real estate was somewhere between seven and 20 percent.  A lack of profitability reflects a number of factors; sometimes it is due to situations outside management's control and other times it is related to management's specific decisions and practices.  Burak did not form an opinion as to why JHBE's profitability was low.  Since JHBE's profits were below acceptable or expected returns, an owner who received an interest from another

---

[30]    Burak reached a higher per share value than K.Coe Isom because:  (1) the properties' appraised value increased from $7.08 million in March 2015 to $7.952 million in September 2015; and (2) K.Coe Isom assumed Ken's debt would not be collected, which reduced the share price by about $204.  Because Burak had been told to expect the loans would be paid and JHBE had not written them off, Burak assumed the debts were collectible.  Moreover, the K.Coe Isom valuation did not consider the tax savings from writing down the debts, which Burak calculated resulted in a $69.50 per share increase if the tax savings were $1.2 million.

25.

shareholder would receive more value by selling JHBE's properties rather than continuing to operate in JHBE's current manner.

## IX. Events After This Litigation Commenced

### A. The May 2016 Shareholder Meeting

In May 2016, Liz received notice of the May 24, 2016 annual shareholders meeting, which stated there would be a discussion and vote regarding reducing the number of directors from five to three, and management intended to present Martha, Robert, and Louise for election to the board. At the shareholders meeting, which Liz did not attend, the number of directors was not reduced; instead, Martha, Robert and Louise were elected, along with Martha and Robert's children, Christine Marsh and Alice Truscott. The president, Martha, reviewed JHBE's operations and stated the share value was $157 per share.

At the annual shareholders meeting held the following year on May 26, 2017, Liz became a board member through cumulative voting by combining hers and Ken's voting shares.[31] At the end of the meeting, Liz requested certain documents from the board as a director. According to Liz, Martha and Robert told her that due to the complex litigation, they did not have time to provide them. Liz, however, previously requested documents as a shareholder, which were given to her.

### B. Ken Attempts to Purchase His Children's Shares

In June 2016, Ken sought to purchase his four children's Class B shares, each of whom held 225 shares, for $550 per share. The purchase price would be due and payable

---

[31] According to the minutes of that meeting, after Liz nominated herself as a director, Robert asked her why she wanted to be on the board, and Liz "responded that her intent was to cause the dissolution of the corporation and to make sure the shareholders' actions as a Board of Directors are proper." While Martha confirmed this was what Liz said, Liz testified the statement was incorrect. Liz said that after she nominated herself, Robert asked her if she was still in favor of dissolving JHBE, and she responded she was. Robert asked her why she wanted to be on the board then, to which she responded she was concerned with management of JHBE and wanted to ensure all the shareholders' rights and interests were being represented.

26.

in 24 months, at five percent interest, and secured by a deed of trust on real property approved by each child. Ken based the share price on appraisals of all corporate property, including outstanding notes owed and due, subtracting the liabilities, and dividing the result by the total number of outstanding shares.

On June 30, 2016, Louise sent a notice of intended sale to the other shareholders. No offers were received, so Louise notified Ken they could proceed with the sale. Nothing happened until October 11, 2016, when Ken's son notified Louise the children were in the process of completing the transfer of their shares and asked for confirmation of JHBE's requirements to make the transfer official.

On October 17, 2016, JHBE notified Ken's son, through its attorney, that "the corporation [was] duty bound to protect itself and the other shareholders by not participating" in the proposed plan. The attorney explained the proposed transaction appeared to be a "disguised attempt" to fraudulently convey assets in an attempt to avoid judgment and Ken's payment obligations to JHBE, since the proposed purchase price was approximately four times the shares' current fair market value and the real property being pledged as collateral was not specified.[32]

### C.   *JHBE's Financial Position*

As a result of the litigation expenses incurred in this case—$58,789 in 2014, $203,079 in 2015, and $211,610 in 2016—JHBE was losing money. JHBE's net interest income, which in 2013 was $100,130 primarily due to Ken's $2.5 million note, turned negative when Ken stopped making payments. The litigation expenses and negative interest income contributed greatly to the decline in JHBE's net revenue.

---

[32]   Ken testified that, given the current state and operation of JHBE, he did not personally feel his shares had any value. He believed the board was not offering fair value for his shares and it was trying to "steal the shares at an unfair price." Ken felt trapped and that he had no opportunity to recover the true value of what the shares were worth.

According to the March 24, 2015 K.Coe Isom valuation report, JHBE's ratio of pretax income to tangible net worth, 2.36, was significantly lower than the industry range of 10.6 to 16.1 percent, which highlighted that JHBE was highly capitalized and conservatively operated. When asked what JHBE was doing to increase the ratio, Martha explained JHBE was being run conservatively in light of the outstanding notes receivable, and until it collected on those notes, it was maintaining a conservative profile. Given Ken's actions so far, JHBE expected he would default on the $2 million note that was due on May 15, 2018, so JHBE was trying to position itself so it could make the balloon payment on the pass-through loan that was due the same day. Robert believed JHBE could be operated successfully for the benefit of all shareholders. If the legal bills and lawsuits ended, and Ken paid his debts to JHBE, JHBE would be in a very good position to invest money in other areas and improve its properties.

Dividends had only been paid twice in JHBE's existence—at 65 cents per share in 2012, and 50 cents per share in 2013. While the board intended to continue paying dividends, they stopped issuing them due to the ongoing litigation.

## X.    This Lawsuit

Liz commenced her lawsuit in December 2014. The operative second amended complaint named JHBE, Louise, Martha, Robert and Ken as defendants and alleged the following causes of action: (1) breach of fiduciary duty against Martha, Robert, and Louise (both direct and derivative); (2) dissolution and accounting against all defendants; and (3) declaratory relief against JHBE regarding the validity of the buy-sell agreement. Louise, Martha, and Robert filed an answer in which they alleged an unclean hands defense.

In March 2015, JHBE filed an action for breach of contract and judicial foreclosure action against Ken and Susan based on Ken's failure to pay the $2.5 million note when it came due in September 2014. In response, Ken and Susan filed a cross-complaint. The operative first amended cross-complaint alleged 19 causes of action and

named as cross-defendants JHBE, Martha, Louise, Robert, Louise's husband, Fredrick, Alice and Christine.[33]  The cross-defendants' answer raised the unclean hands defense.

The two actions were consolidated in February 2016.

On October 11, 2016, the trial court granted JHBE's summary judgment motion on JHBE's complaint, finding Ken was in breach of the note and JHBE could judicially foreclose on the property that secured the note.  On October 31, 2016, the trial court entered judgment in favor of JHBE for foreclosure of the deed of trust and a deficiency judgment against Ken and Susan, both as trustees and individually, to the extent the sales proceeds were insufficient to pay the outstanding debt.  Ken and Susan appealed the judgment; we reversed the trial court's determination of the value of the debt owed JHBE, but in all other respects affirmed the judgment.  (*J.H. Boyd Enterprises, Inc. v. Kenneth Robert Boyd* (Mar. 6, 2019, F074903) [nonpub. opn.].)

In November 2016, the trial court granted summary adjudication in favor of cross-defendants on 15 of the causes of action alleged in Ken and Susan's cross-complaint.[34]  This left the following causes of action to be tried:  (1) breach of fiduciary duty against Martha, Louise and Robert; (2) breach of fiduciary duty and negligence (derivative) against Martha, Louise, Robert, Alice and Christine; (3) conspiracy against Alice and Christine; and (4) dissolution and accounting against JHBE.

A court trial on Liz's complaint and the remaining causes of action in Ken and Susan's cross-complaint commenced on May 24, 2017, and concluded on July 13, 2017, after 24 days of trial.  After the attorneys' closing arguments, the trial court ruled from the bench, finding in favor of respondents on Ken and Susan's cross-complaint and Liz's

---

[33]    By the time of trial, Fredrick Autenrieb was no longer a party.

[34]    Ken appealed from the resulting judgment on these causes of action.  We affirmed the judgment in a nonpublished opinion in *Kenneth R. Boyd v. J.H. Boyd Enterprises, Inc.* (Jun. 1, 2020, F075161).

29.

complaint. Ken's attorney requested a statement of decision, and the trial court directed the individual defendants' attorney to prepare one.

Appellants filed objections to the proposed statement of decision and a later-filed revised statement of decision. Ken and Susan also submitted an alternative proposed statement of decision, with findings in favor of appellants. At a September 28, 2017 hearing, the trial court overruled the parties' objections and asked the individual defendants' attorney to submit a further revised statement of decision, which the trial court signed and filed on October 26, 2017.

The trial court found respondents had not committed any acts of negligence, fraud, unfairness, mismanagement, or malfeasance to any shareholders, as asserted by appellants. The trial court also found appellants did not meet their burden of showing respondents caused them to suffer any damages. Finally, the trial court found involuntary dissolution of JHBE was not warranted because appellants failed to present sufficient evidence to persuade it the requirements of Corporations Code section 1800, subdivision (b)(3), (4) or (5), had been met, and dissolution was unnecessary to protect the rights or interests of the complaining shareholders.

With respect to the unclean hands defense, the trial court found Ken and Susan engaged in unconscientious conduct that constituted unclean hands, which barred them from any recovery in the action, because they failed and refused to repay the $2.5 million loan despite Ken's testimony he was willing and able to do so. The trial court also found Liz's portrayal of what happened on November 3, 2012, when she and Joe signed the buy-sell agreement, was intentionally inaccurate and therefore unconscientious, and that J.H. did not coerce them to sign. Specifically, the court found it was unconscientious, thereby constituting unclean hands, for Liz to seek to invalidate the buy-sell agreement by falsely claiming J.H. coerced she and Joe to sign the agreement.

Judgment was entered on November 16, 2017, and notice of entry of judgment served on the parties on December 8, 2017. Liz filed a motion for new trial, in which Ken and Susan joined. The new trial motion was denied.

## DISCUSSION

### I. The Motion to Dismiss Ken and Susan's Appeal

We first address JHBE's motion to dismiss Ken and Susan's appeal, in which the individual defendants joined.[35] "Under California law, if an appeal is untimely, the appellate court has no jurisdiction to consider its merits and the appeal must be dismissed." (*Sanchez v. Strickland* (2011) 200 Cal.App.4th 758, 762 (*Sanchez*), citing Cal. Rules of Court,[36] rule 8.104(b).) Respondents contend we must dismiss Ken and Susan's appeal because their notice of appeal was untimely.

#### A. *Background Facts*

Liz initiated her action against JHBE, Louise, Martha, Robert, and Ken in December 2014, which was assigned case No. 14CECG03792. A year later, Liz filed a second amended complaint alleging Martha, Louise, and Robert breached their fiduciary duties, and JHBE should be dissolved.

JHBE initiated its action against Ken and Susan for judicial foreclosure and related claims on March 20, 2015, which was assigned case No. 15CECG00915. A first

---

[35] Ken and Susan contend JHBE does not have standing to bring the motion to dismiss because JHBE: (1) was merely a nominal cross-defendant in Ken and Susan's derivative breach of fiduciary claim; (2) was not named as a cross-defendant in their claims against JHBE's controlling directors as individuals; (3) had a duty to remain neutral with respect to their dissolution claim; and (4) did not participate in the trial. Even if Ken and Susan are correct that JHBE lacks standing, the individual defendants, who clearly have standing, joined in JHBE's motion for the reasons stated therein. Moreover, if Ken and Susan's notice of appeal is untimely, we have no choice but to dismiss the appeal on our own motion. (*Nu-Way Associates, Inc. v. Keefe* (1971) 15 Cal.App.3d 926, 928–929.) Accordingly, we will consider the merits of respondents' arguments.

[36] All further rule references are to the California Rules of Court.

31.

amended complaint was filed on June 5, 2015. Ken and Susan filed a cross-complaint against JHBE, Martha, Louise, Robert and Fredrick in August 2015, alleging claims for, among other things, breach of fiduciary duty and dissolution of JHBE. Liz was not a party to either JHBE's complaint or Ken and Susan's cross-complaint.

In February 2016, the parties in Liz's and JHBE's cases entered into a written stipulation to consolidate the two cases, which the trial court ordered based on good cause. The stipulation stated: "[B]ecause the cases below involve the same parties and the same or similar facts and issues, it is agreed that the cases be consolidated, and that all subsequent papers be filed under the caption and case number of the above-entitled court. [¶] That Fresno County Superior Court case number 14CECG03792, *[Lizbeth] Boyd v. J.H. Boyd Enterprises, Inc., et. al,* is hereby consolidated into Fresno County Superior Court case number 15CECG00915, *J.H. Boyd Enterprises, Inc. v. Boyd, et. al.*, and its related cross-claim. [¶] The parties further stipulate that the consolidated actions will proceed under the lead case number of 15CECG00915 in the Fresno County Superior Court." The stipulation provided that, as a result of the consolidation, the trial and all scheduled hearings in Liz's case were vacated.

At the commencement of the bench trial, JHBE's attorney told the trial court he thought the matters being tried were primarily derivative in nature and the other attorneys agreed he did not have to be present during trial unless an unanticipated issue arose that would involve JHBE. After Liz's attorney confirmed the agreement, the trial court granted JHBE's attorney's request not be present during trial.

In its statement of decision following the bench trial, the trial court made one set of factual and legal findings on Ken's, Susan's, and Liz's claims. The trial court then summarized the findings with reference to Ken's and Susan's pleadings, and Liz's pleadings, addressing each cause of action alleged in Liz's second amended complaint and the four causes of action in Ken and Susan's first amended cross-complaint that were adjudicated at trial.

32.

The trial court issued one judgment on November 16, 2017, which referenced the "consolidated lawsuit" and stated the court found Liz, Ken, and Susan "failed to produce sufficient evidence to meet their burden of proof on all of their claims that were presented at trial." The judgment listed each cause of action alleged in Liz's complaint, stating for each one that she failed to produce sufficient evidence to meet her burden of proof, and three causes of action alleged in Ken and Susan's cross-complaint, stating for each one that they failed to produce sufficient evidence to meet their burden of proof. The judgment, however, omitted Ken and Susan's ninth cause of action for dissolution and accounting. Finally, the judgment stated Liz would take nothing by reason of her second amended complaint, Ken and Susan would take nothing by reason of their first amended cross-complaint, and JHBE and the individual defendants would recover their costs of suit in an amount established pursuant to a timely memorandum of costs, which may be subject to a motion to tax costs by Liz and/or Ken and Susan. On December 8, 2017, the individual defendants' attorney served notice of entry of judgment on the other parties.

On December 26, 2017, Liz, through her attorney, filed a notice of intent to move for a new trial. Ken and Susan, through their separate attorneys, each filed a joinder in support of Liz's new trial motion. The trial court set a hearing on the motion for February 14, 2018. At the hearing, the individual defendants' attorney asserted the trial court did not have jurisdiction to rule on the new trial motion, as more than 60 days had passed since notice of entry of judgment. The trial court stated it would mail a decision, which it did the following day; the trial court denied the motion.

Ken and Susan filed a notice of appeal from the November 16, 2017 judgment and February 14, 2018 order on February 23, 2018, while Liz filed her notice of appeal from the same judgment and order on March 7, 2018.

Meanwhile, on January 29, 2018, the individual defendants filed a motion to amend the November 16, 2017 judgment pursuant to Code of Civil Procedure section 473. They argued the trial court had the inherent power to correct what they asserted

33.

were clerical errors in the judgment, namely, the omission of the ninth cause of action for dissolution and accounting and the incorporation by reference of a November 30, 2016 summary adjudication order, which eliminated many of the claims in Ken and Susan's cross-complaint. The individual defendants asked the trial court to enter the amended judgment nunc pro tunc to the November 16, 2017 entry of judgment.

Hearing on the motion to amend the judgment was held on March 1, 2018. The trial court granted the motion and adopted the proposed amended judgment nunc pro tunc as of November 16, 2017. The amended judgment added the ninth cause of action for dissolution and accounting to the list of causes of action in Ken and Susan's first amended complaint and stated Ken and Susan failed to produce sufficient evidence to meet their burden of proof on that claim.

### B. Analysis

As relevant here, a notice of appeal must be filed on or before 60 days after the date of service of the notice of entry of judgment, unless the period is extended by another statute or rule. (Rule 8.104(a)(1)(A).) Since notice of entry of judgment was served on Ken's and Susan's attorneys on December 8, 2017, absent an extension, Ken and Susan had until February 6, 2018, to file a notice of appeal.

The time to appeal is extended when any party files a valid notice of intention to move for a new trial and the motion is subsequently denied. Rule 8.108(b)(1) provides, in relevant part: "If any party serves and files a valid notice of intention to move for a new trial, the following extensions apply: [¶] (1) If the motion for a new trial is denied, the time to appeal from the judgment is extended for all parties until the earliest of: (A) 30 days after the superior court clerk or a party serves an order denying the motion or a notice of entry of that order; (B) 30 days after denial of the motion by operation of law."

Here, Liz's motion for new trial was denied by operation of law on February 6, 2018—60 days after the December 8, 2017, service of notice of entry of judgment.

(See former Code Civ. Proc., § 660;[37] *Dakota Payphone, LLC v. Alcaraz* (2011) 192 Cal.App.4th 493, 500 ["If the motion for a new trial is not ruled upon within the 60-day time period, then 'the effect shall be a denial of the motion without further order of the court.' (§ 660.)"].) Thus, the deadline to file a notice of appeal was extended to March 8, 2018—30 days from February 6, 2018.

While Ken and Susan filed their notice of appeal before March 8, 2018, respondents argue they are not entitled to rely on the extended time to appeal from the judgment because the rule of court does not apply to them. Although rule 8.108(b)(1)(B) extends the time to appeal *for all parties* whenever *any party* files a valid notice of intention to move for a new trial, respondents argue Ken and Susan were not parties with respect to Liz's notice of intent because the two cases remained separate as the consolidation was for purposes of trial only.

Code of Civil Procedure section 1048, subdivision (a), authorizes the trial court, when appropriate, to "order a joint hearing or trial" or to "order all the actions consolidated."[38] Thus, under both the statute and case law, there are "two types of consolidation: a consolidation for purposes of trial only, where the two actions remain otherwise separate; and a complete consolidation or consolidation for all purposes, where the two actions are merged into a single proceeding under one case number and result in only one verdict or set of findings and one judgment." (*Hamilton v. Asbestos Corp.* (2000) 22 Cal.4th 1127, 1147 (*Hamilton*).)

---

**37** The 60-day period in which to rule on the new trial motion was extended to 75 days effective January 1, 2019. (Code Civ. Proc., § 660; Stats. 2018, ch. 317, § 1, eff. Jan. 1, 2019.)

**38** Code of Civil Procedure section 1048, subdivision (a) provides: "When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay."

In *Hamilton*, our Supreme Court concluded the parties had consolidated two actions for all purposes, and not for trial only, based on the language of the trial court's consolidation order: "More important, the court's order granting the motion was not limited to a consolidation for trial: rather the court declared that 'IT IS ORDERED that Action[s] Nos. 955576 and 975884 *are consolidated as Action No. 955576.*" (*Hamilton*, *supra*, 22 Cal.4th at p. 1148.) The court also noted all further filings by the parties bore only a single title and case number, No. 955576, and "there was only one verdict and one judgment." (*Ibid.*) Moreover, throughout trial, the clerk's minutes designated the proceeding by one title and case number, "adding for identification only, 'consol. w/ 975884.' " (*Ibid.*)

Here, the record shows the two actions were consolidated into one for all purposes. Most importantly, the parties' stipulation for consolidation was not limited to a consolidation for trial. The stipulation stated the parties agreed to consolidate the two cases because they involved the same parties and same or similar facts and issues. They further agreed Liz's action, case No. 14CECG03792, was "*consolidated into*" the JHBE/Ken and Susan action, case No. 15CECG00915, "and its related cross-claim," and the consolidated actions would proceed under the lead case of 15CECG00915, with all subsequent papers filed under that caption and case number. (Italics added.) Moreover, as a result of the consolidation, both "the trial *and all scheduled hearings currently set*" in Liz's action were vacated. (Italics added.)

In our view, the stipulation's language is one of complete consolidation. The stipulation provides that Liz's action was consolidated into Ken and Susan's, with Ken and Susan's case becoming the lead case, and all subsequent papers filed under their case's caption and case number. While further filings continued to list Liz's case number on the caption, that was for identification purposes only. All scheduled hearings in Liz's case were vacated, not just the trial, which indicates future hearings would be held in conjunction with Ken and Susan's case. In addition, the actions were consolidated a year

36.

before trial, when discovery was ongoing.  Finally, although the statement of decision and judgment contain separate findings as to each cause of action alleged in Liz's complaint and Ken and Susan's cross-complaint, the trial court made one set of factual and legal findings in the statement of decision when discussing the parties' contentions, and rendered one judgment, which stated respondents would recover their costs of suit without delineating an allocation of costs between Liz, and Ken and Susan.

Citing *Sanchez v. Superior Court* (1988) 203 Cal.App.3d 1391, respondents argue the cases could not have been consolidated for all purposes because, in order to have a complete consolidation the parties to each lawsuit must be identical, and here Liz was never a party in Ken and Susan's case.  But *Sanchez* does not support this proposition.  The court in *Sanchez* rejected the plaintiffs' argument that the two cases had been consolidated for all purposes when "there were two different sets of plaintiffs who pleaded their cases separately and would presumably expect separate judgments," and when there was "no indication in the record that the two complaints in these actions became merged.  On the contrary, the actions retained their separate numbers." (*Id.* at p. 1396.)  Although the court considered the different sets of plaintiffs in determining whether the cases had been consolidated for all purposes and noted that complete consolidation "may be utilized where the parties are identical and the causes could have been joined," nowhere did the court state that consolidation for all purposes *requires* the same plaintiffs or parties.  (*Ibid.*)  Nor does the consolidation statute require identical parties.  (Code Civ. Proc., § 1048 [stating only "a common question of law or fact" is needed to support consolidation].)[39]

---

[39]     Respondents' reliance on *Hamilton*, for the proposition that identical parties are required, is misplaced.  While by the time of trial the parties were identical, when the two cases were consolidated, the defendants in both cases were not identical—while there was one common defendant, the remaining defendants differed between the two cases. (*Hamilton*, *supra*, 22 Cal.4th at pp. 1133–1134.)  Moreover, the identity of the parties did not factor into the Supreme Court's consolidation analysis.  (*Id.* at pp. 1147–1149.)

Since the two cases were consolidated for all purposes, Liz, Ken, and Susan were parties to the same action. Therefore, because Liz served and filed a valid notice of intention to move for a new trial, once the motion was denied by operation of law, the time to appeal was extended for all parties, including Ken and Susan, and their notice of appeal was timely.[40]

## II.    The Joint Respondents' Brief

JHBE and the individual defendants, represented by separate counsel, filed a joint respondents' brief addressing the arguments raised in appellants' opening briefs. In their reply briefs, appellants object to JHBE participating in this appeal. Noting that JHBE's counsel declined to participate in the trial due to the derivative nature of most claims, they argue JHBE's counsel has a conflict of interest by representing the interests of the majority shareholders, citing *Gong v. RFG Oil, Inc.* (2008) 166 Cal.App.4th 209 (*Gong*). Ken and Susan argue JHBE's participation exemplifies "the stranglehold the majority shareholders have on JHBE," demonstrates the majority shareholders give no regard to the minority shareholders' rights and interests, and provides further evidence that dissolution is the only way to protect the minority shareholders' assets. Liz argues that because the claims addressed on appeal are derivative, JHBE may not participate in the defense of those claims, citing *Patrick v. Alacer Corp.* (2008) 167 Cal.App.4th 995, and for that reason, we should strike the respondents' brief.

Shareholders may bring two types of actions, a "*direct* action filed by the shareholder individually (or on behalf of a *class* of shareholders to which he or she belongs) for injury to his or her interest *as a shareholder*," or a "*derivative* action filed on *behalf of the corporation* for *injury to the corporation* for which it has failed or refused to sue." (Friedman, Cal. Practice Guide: Corporations (The Rutter Group Feb. 2020

---

[40]    Since we find Ken and Susan's appeal was timely based on rule 8.108(b)(1), we do not reach Ken and Susan's other arguments concerning the timeliness of the appeal, including whether the amended judgment superseded the original judgment.

Update) ¶ 6:598.)  "Ordinarily, the two actions are mutually exclusive:  i.e., the right of action and recovery belongs to *either* the *shareholders* (direct action) *or* the *corporation* (derivative action)."  (Friedman, *supra*, ¶ 6:598.1.)  A derivative suit is brought on the corporation's behalf where management or a third party breaches a duty owed to the corporation and the corporation fails to assert its cause of action.  (Friedman, *supra*, ¶ 6:602.)  "The shareholder is merely a nominal plaintiff in such an action.  Even though the corporation is joined as a nominal defendant [], it is the real party in interest to which any recovery usually belongs."  (Friedman, *supra*, ¶ 6:602.)

In a derivative action, the corporation's refusal to join is why the shareholder names the corporation as a nominal defendant, although the corporation is the real plaintiff.  (*Patrick v. Alacer Corp.*, *supra*, 167 Cal.App.4th at p. 1004.)  " 'The corporation has traditionally been aligned as a defendant because it is in conflict with its stockholder over the advisability of bringing suit....'  [Citation.]  In a real sense, the only claim a shareholder plaintiff asserts against the nominal defendant corporation in a derivative action is the claim the corporation has failed to pursue the litigation."  (*Ibid.*)  "[A] nominal defendant corporation generally may not defend a derivative action filed on its behalf."  (*Id.* at p. 1005.)  While the corporation may assert defenses contesting the plaintiff's right or decision to bring suit, "the corporation has no ground to challenge the merits of a derivative claim filed on its behalf and from which it stands to benefit."  (*Ibid.*)

Unlike a shareholder's derivative suit, which seeks to vindicate a corporate right, a minority shareholder's suit for dissolution of a corporation is a direct suit for damage to the shareholder as an individual, independent of any damage to the corporation.  (*Rankin v. Frebank Co.* (1975) 47 Cal.App.3d 75, 92; Friedman, Cal. Practice Guide: Corporations, *supra*, ¶¶ 6:599, 6:601 [an action to compel dissolution is a direct, not a derivative, shareholder action].)  Thus, the corporation is a proper defendant who can defend itself against dissolution.  (See, e.g., *Stuparich v. Harbor Furniture*

39.

*Manufacturing, Inc.* (2000) 83 Cal.App.4th 1268, 1272 (*Stuparich*) [corporation named as defendant in involuntary dissolution action brought motion for summary judgment]; *Stumpf v. C.E. Stumpf & Sons, Inc.* (1975) 47 Cal.App.3d 230, 232 (*Stumpf*) [corporation named as sole defendant in involuntary dissolution action appealed from judgment decreeing its dissolution].)

Here, appellants brought direct and derivative claims of breach of fiduciary duty against Martha, Louise, and Robert, and claims for dissolution and accounting against JHBE, with Liz also naming Martha, Louise, Robert and Ken as defendants in her dissolution claim. The trial court found against appellants on all these claims. On appeal, appellants only challenge the trial court's ruling on their dissolution claims.[41] The dissolution claims are not derivative claims, but rather direct actions against JHBE, which has an interest in its continued existence. Accordingly, JHBE is an appropriate party to defend against appellants' attempts to dissolve it, and may participate in this appeal.

Appellants argue JHBE's counsel has a conflict of interest by participating in this appeal because counsel is representing the interests of the majority shareholders. In a

---

[41] In her opening brief, Liz states under the heading "Issues To Be Decided" (unnecessary capitalization omitted) that the "issue" is whether the trial court erred in deciding "there were no breaches of duty and that dissolution was not appropriate," and adds "[t]he trial court also erred in not granting a new trial." To the extent Liz is asserting the trial court should have found in her favor on her breach of fiduciary duty claims and granted her new trial motion, she does not include these contentions within the argument section of her brief. Each point must have a discrete section with a separate heading, and must be supported by reasoned legal argument and authority. (*Provost v. Regents of University of California* (2011) 201 Cal.App.4th 1289, 1294 ["we do not consider all of the loose and disparate arguments that are not clearly set out in a heading and supported by reasoned legal argument"]; *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 ["[w]hen an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived"]; rule 8.204(a)(1)(B) [each point must be separately headed and supported by argument and authority if available].) The lack of headings and reasoned argument concerning breach of fiduciary duty and the new trial motion forfeits those issues.

derivative suit alleging fraud by the principals, case law forbids dual representation of the corporation and the principals because they have adverse, conflicting interests. (*Gong, supra*, 166 Cal.App.4th at pp. 214–215.) Moreover, "where a shareholder has filed an action questioning [a corporation's] management or the actions of individual officers or directors, such as in a shareholder derivative or the instant dissolution action, corporate counsel cannot represent both the corporation and the officers, directors or shareholders with which the corporation has a conflict of interest." (*La Jolla Cove Motel & Hotel Apartments, Inc. v. Superior Court* (2004) 121 Cal.App.4th 773, 785–786.)

This, however, is not a dual representation case, as JHBE and the individual defendants have separate counsel. JHBE and the individual defendants, however, did file a joint respondents' brief, which was signed by both attorneys. That the two attorneys have aligned to oppose dissolution, however, does not create a conflict of interest. "[A]bsent a factual scenario suggesting a conflict exists, an involuntary dissolution action does not necessarily pit the corporation against the defendant owner in the manner of a derivative action." (*Coldren v. Hart, King & Coldren, Inc.* (2015) 239 Cal.App.4th 237, 247.) This is because, to the extent JHBE "has any interest at all in the outcome of the dissolution action, its interest is in its continued existence," and if the individual defendants also want JHBE to continue, then there is no conflict. (*Ibid.*)

Moreover, even if the interests of JHBE and the individual defendants diverge, JHBE has separate counsel which can exercise its professional judgment in JHBE's best interest without the constraint of simultaneously promoting and protecting the individual defendants' interests in the litigation, thereby preserving the duty of loyalty. (*Gong, supra*, 166 Cal.App.4th at p. 216.) While counsel for a corporation should "refrain from taking part in any controversies or factional differences among shareholders *as to control of the corporation …*" (*Metro-Goldwyn-Mayer, Inc. v. Tracinda Corp.* (1995) 36 CalApp.4th 1832, 1842, italics added), the issue on appeal is not over control of

JHBE, but rather its very existence.  Accordingly, there is no reason to strike the respondents' brief and we decline to do so.

## III.  Involuntary Dissolution

### A.  Section 1800

"The dissolution of a corporation is an equitable action in which jurisdiction is granted by statute, and a court of equity is to take jurisdiction of the cause, once a requisite showing is made, and then exercise its discretion in granting or refusing equitable relief."  (7B Am. Jur. Pl. & Pr. Forms Corporations § 439; *Weisman v. Odell* (1970) 3 Cal.App.3d 494, 496–497 [an involuntary dissolution action "is in the nature of a special proceeding in that the proceedings and relief sought are created by statute"].)  In California, section 1800 grants the trial court jurisdiction to order the involuntary dissolution of a corporation upon the verified complaint of one or more shareholders meeting the qualifications listed in the statute.  (§ 1800, subd. (a)(2), (3).)  The accepted grounds for dissolution are also specified by the statute and range from deadlocked factions to abandonment.  (§ 1800, subd. (b)(1)-(6).)

The grounds for dissolution at issue here are section 1800, subdivision (b)(4) and (5).  Section 1800, subdivision (b)(4) (hereafter subd. (b)(4)) allows for dissolution where "[t]hose in control of the corporation have been guilty of or have knowingly countenanced persistent and pervasive fraud, mismanagement or abuse of authority or persistent unfairness toward any shareholders or its property is being misapplied or wasted by its directors or officers."  Section 1800, subdivision (b)(5) (hereafter subd. (b)(5)), authorizes dissolution where "reasonably necessary" to protect a shareholder's "rights or interests" in a "corporation with 35 or fewer shareholders."

When faced with an action for involuntary dissolution under section 1800, a corporation has a statutory right to avoid dissolution by purchasing for cash and at "fair value" the shares held by any shareholder who has sued to dissolve the corporation.

(§ 2000, subd. (a).)  If the corporation declines to exercise this right, the holders of 50 percent or more of the voting shares may do so.  (*Ibid.*)

We review the denial of a request for dissolution for an abuse of discretion. (*Stumpf*, *supra*, 47 Cal.App.3d at p. 235 ["involuntary dissolution is not an automatic remedy but, rather, a matter for the court's discretion"]; § 1804 ["After hearing the court may decree a winding up and dissolution of the corporation if cause therefor is shown or, … may make such orders and decrees and issue such injunctions … as justice and equity require."].)  "The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review."  (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712.)  When the trial court's factual findings are challenged, we review them for substantial evidence.  (*Id.* at p. 711.)  When the trial court's resolution of a question of law is challenged, we review its legal conclusion de novo.  (*Id.* at pp. 711–712.)  Finally, the trial court's application of the law to the facts is reversible only if arbitrary and capricious.[42]  (*Id.* at p. 712.)  Stated another way, the results of the trial court's "weighing process generally will be upheld on appeal so long as the trial court did not exceed the bounds of reason."  (*County of Kern v. T.C.E.F.*, *Inc.*, *supra*, 246 Cal.App.4th 301, 316.)

Under the deferential substantial evidence standard of review, "findings of fact are liberally construed to support the judgment and we consider the evidence in the light

---

[42]    Liz contends the trial court's application of the law to the facts here is primarily a legal decision, and therefore de novo review applies, citing *Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888.  But there the question before the court, namely, the classification of an item of personal property as a fixture, was predominantly legal, the pertinent inquiry required "a critical consideration, in a factual context, of legal principles and their underlying values."  (*Ibid.*)  In contrast here, whether a trial court should order an involuntary dissolution is an equitable one, not a legal one, that is within the trial court's discretion.  Of course, as Liz points out, applying the wrong legal standard or an incorrect rule of law is an abuse of discretion. (*Conservatorship of Bower* (2016) 247 Cal.App.4th 495, 506; *County of Kern v. T.C.E.F., Inc.* (2016) 246 Cal.App.4th 301, 316.)

most favorable to the prevailing party, drawing all reasonable inferences in support of the findings." (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.) "The trial court sits as trier of fact and it is called upon to determine that a witness is to be believed or not believed. This is the nature of factfinding. 'The trier of fact is the sole judge of the credibility and weight of the evidence….' " (*In re Marriage of Greenberg* (2011) 194 Cal.App.4th 1095, 1099.)

A different standard of review applies, however, when the trier of fact has expressly or implicitly concluded the party with the burden of proof did not carry that burden. When that party appeals, " 'it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment…. [¶] Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838; accord, *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.)

### B. Unclean Hands

We first address the trial court's unclean hands findings. With respect to Ken and Susan, the trial court found they were barred from recovery because they failed and refused to repay the $2.5 million loan, despite Ken's testimony that he was willing and able to do so. With respect to Liz, the trial court found her account of what occurred when she and Joe signed the buy-sell agreement was "intentionally inaccurate," and it was unconscientious for her to seek to invalidate the buy-sell agreement by falsely claiming she and Joe were coerced into signing it.

Appellants failed to address the merits of these findings in their opening briefs or the impact of those findings on their claims of error. Respondents assert it is undisputed

44.

the trial court found Liz's complaint, and Ken and Susan's cross-complaint, were barred by their unclean hands; therefore, the unclean hands defense is dispositive of their appeals. Citing the general rules that appellate courts will not advance arguments that an appellant does not timely and fully raise (*Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 761, fn. 4), will deem issues not presented in the appellant's opening brief to be waived or abandoned (*Wurzl v. Holloway* (1996) 46 Cal.App.4th 1740, 1755, fn. 1), and ordinarily will not consider arguments raised for the first time in a reply brief, unless good reason is shown for the failure to present them earlier (*Tellez v. Rich Voss Trucking, Inc.* (2015) 240 Cal.App.4th 1052, 1066), respondents argue appellants' failure to challenge the unclean hands findings in their opening briefs means they have forfeited or abandoned the issue. Respondents further argue that since the unclean hands findings are dispositive of the entire case, we should either dismiss the appeals or affirm the judgment.

Appellants address this argument in their reply briefs. Ken and Susan assert the unclean hands doctrine does not apply to deny a litigant the statutory right of dissolution under subdivision (b)(5). They point out the doctrine is not used to punish a plaintiff, but rather to maintain the status quo, citing *O'Flaherty v. Belgum* (2004) 115 Cal.App.4th 1044, 1060. Finally, they assert the extent of the bar the trial court imposed is ambiguous, as the word "recovery" used in its finding that they are barred "from any recovery in this action" implies they were prevented from recovering monetary damages for negligence and breach of fiduciary duty, not from being able to dissolve the corporation, which does not result in a recovery.

Liz asserts she did not need to address the unclean hands finding in her opening brief because it is irrelevant to the issues she raises on appeal. She contends the trial court did not deny dissolution based on her unclean hands and to the extent the trial court found unclean hands, it was tied only to the validity of the buy-sell agreement. She points out she objected to this finding, arguing the finding she was "intentionally

45.

inaccurate" was not supported by the evidence and taking a legal position that the buy-sell agreement was unenforceable could not constitute unclean hands.  She asserts the issue on appeal as to the buy-sell agreement is not whether she was coerced into signing it, but whether the agreement is illusory or otherwise fails to protect the shareholders' rights or interests under subdivision (b)(5), or constitutes mismanagement under subdivision (b)(4).  Since the disputed testimony does not pertain to the subject matter of this appeal, she argues it is irrelevant.

### 1.  The Unclean Hands Doctrine

"The [unclean hands] doctrine demands that a plaintiff act fairly in the matter for which he seeks a remedy.  He must come into court with clean hands, and keep them clean, or he will be denied relief, regardless of the merits of his claim." (*Kendall–Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 978 (*Kendall–Jackson*).)  "Unclean hands applies when it would be inequitable to provide the plaintiff any relief, and provides a complete defense to both legal and equitable causes of action. [Citations.]  'Whether the defense applies in particular circumstances depends on the analogous case law, the nature of the misconduct, and the relationship of the misconduct to the claimed injuries.' " (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 56.)

While not every wrongful act constitutes unclean hands, the misconduct need not be a crime or an actionable tort.  Rather, any conduct that violates conscience, or good faith, or other equitable standards of conduct is sufficient cause to invoke the doctrine. (*Kendall–Jackson*, *supra*, 76 Cal.App.4th at p. 979.)  There must be a connection, generally described as a direct relationship, between the complaint and the equitable defense. (*Unilogic, Inc. v. Burroughs Corp.* (1992) 10 Cal.App.4th 612, 621; *Kendall–Jackson*, at p. 979.)  Prior misconduct that only indirectly affects the problem before the court does not suffice. (*Kendall–Jackson*, at p. 979.)  " 'A person is not placed forever entirely outside the protection of the law in a particular transaction, because, forsooth,

46.

some time in the distant past he was guilty of an improper act.' " (*Unilogic, Inc. v. Burroughs Corp.*, at p. 621.)

Nevertheless, the requirement of a direct relationship between the alleged misconduct and the cause of action is not to be construed in an unreasonably narrow manner. (*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 681.) Rather, "[t]he question is whether the unclean conduct relates directly 'to the *transaction* concerning which the complaint is made,' i.e., to the '*subject matter* involved' [citation], and not whether it is part of the basis upon which liability is being asserted." (*Ibid.*) The doctrine is applied based on evidence of a plaintiff's unclean hands that relates to the transaction before the court and affects the equitable relationship between the litigants. (*Kendall–Jackson*, *supra*, 76 Cal.App.4th at p. 985.)

"The decision of whether to apply the defense based on the facts is a matter within the trial court's discretion." (*Dickson, Carlson & Campillo v. Pole* (2000) 83 Cal.App.4th 436, 447; see *Aguayo v. Amaro* (2013) 213 Cal.App.4th 1102, 1109 [reviewing trial court's decision to apply unclean hands defense for abuse of discretion and trial court's factual findings for substantial evidence].)

### 2. The Unclean Hands Findings

The issue for appellants is whether the trial court's unclean hands findings bar the dissolution claims they are challenging on appeal. If so, it was incumbent on them to address the issue of unclean hands in their opening briefs, and their failure to do so may constitute an abandonment of that issue.

With respect to Liz, the trial court found Liz's unclean hands consisted of giving an "intentionally inaccurate" account of what happened at J.H.'s house on November 3, 2012, when she and Joe signed the buy-sell agreement, and it was unconscientious of Liz to seek to invalidate the buy-sell agreement by falsely claiming J.H. coerced she and Joe to sign the agreement. The trial court did not specify in the statement of decision which

47.

causes of action were barred by its unclean hands finding. We agree with Liz that the finding cannot pertain to her dissolution cause of action because Liz's misconduct—falsely testifying J.H. coerced she and Joe into signing the buy-sell agreement—does not relate to her claims that dissolution is required due to persistent mismanagement or unfairness, or that dissolution is reasonably necessary to protect her rights and interests. Since Liz's misconduct does not pertain to the subject matter of her dissolution cause of action, the unclean hands finding does not bar that claim. Therefore, Liz was not required to address the unclean hands finding in her opening brief.

With respect to Ken and Susan, the trial court found they "engaged in unconscientious conduct constituting unclean hands which bars them from any recovery in this action because they have failed and refused to pay J.H. Boyd Enterprises, Inc.[,] the substantial debt they owe the corporation for the $2.5 Million loan. This finding is based on Ken Boyd's own testimony that he is willing and able (he estimates his worth to be $17 M) to repay the corporation, yet the Boyd Trust still persists in not paying a debt that is owed." While the trial court did not list the causes of action barred by the unclean hands finding, it did say that Ken and Susan were barred "from any recovery in this action," which suggests that all of their claims are barred. Ken and Susan contend the word "recovery" is ambiguous and only applies to the claims in which they sought to recover monetary damages, namely, the breach of fiduciary duty and negligence claims. They assert that dissolution does not result in a "recovery" by any party, as dissolution is merely a mechanism that enables the shareholders to convert their stock into money.

This interpretation of recovery, however, is narrow. While a shareholder seeking involuntary dissolution does not recover damages if the shareholder proves dissolution is warranted, the shareholder does recover what they otherwise could not, namely, payment for the value of the shares. In that sense, if the trial court had ordered dissolution of JHBE, Ken and Susan ultimately would have recovered the monetary value of their shares. Thus, the trial court's statement of decision does apply the finding of unclean

48.

hands to bar all of Ken and Susan's causes of action, including the dissolution action. For that reason, Ken and Susan should have addressed the merits of the unclean hands finding in their opening brief.

In their reply brief, Ken and Susan make two arguments concerning the merits of the unclean hands finding: (1) the unclean hands doctrine may not be applied to deny a litigant a statutory right of dissolution under subdivision (b)(5); and (2) they should not have been punished for failing to pay the $2.5 million note, since Ken and Susan's appeal from the judgment of foreclosure on the note was pending at the time of trial.

As to the first point, Ken and Susan cite absolutely no authority to support their claim the unclean hands doctrine does not apply to a demand for dissolution under subdivision (b)(5), and their argument consists of only bare statements that it does not apply. We note that a dissolution action is an equitable one that requires the trial court to exercise its discretion in granting or refusing equitable relief (7B Am. Jur. Pl. & Pr. Forms Corporations § 439), and the unclean hands doctrine applies to equitable actions. (*Fladeboe v. American Isuzu Motors Inc.*, *supra*, 150 Cal.App.4th at p. 56.) We further note that one appellate court concluded "[i]t would be tantamount to sanctioning abuse to permit minority shareholders acting in bad faith to use subdivision (b)(5) as a coercive tool to force an involuntary dissolution." (*Bauer v. Bauer* (1996) 46 Cal.App.4th 1106, 1117 (*Bauer*).) While the court in *Bauer* was not addressing an unclean hands defense, but instead was reviewing the trial court's decision not to order an involuntary liquidation where the minority shareholders had set up a competing company and solicited the corporation's customers and business for themselves, bad faith conduct by minority shareholders also would justify application of the unclean hands defense to a dissolution action.

As to the second point, while Ken and Susan assert they should not be punished for litigating the terms of the repayment obligation, that was not the case here. Ken admitted at trial he owed $2.5 million to JHBE on the note and he had the means to pay

the debt. His litigation over the note centered on *when* the debt was due. But the failure to pay the note led to cascading problems for JHBE. Instead of trying to assist the corporation he helped build and honor his promise to repay the debt, Ken and Susan litigated the repayment issue at every turn and attempted to dissolve JHBE, based in part on JHBE's acquisition of the $2.5 million note that Ken assured his siblings he would repay. The trial court did not abuse its discretion in determining it would be inequitable to provide Ken and Susan the dissolution they requested, especially since Ken's actions contributed to the purported claims of mismanagement.

Since Ken and Susan failed to address the merits of the unclean hands defense in their opening brief, and their arguments in reply do not convince us that the trial court erred in applying the defense to his dissolution claim, we agree with respondents that the defense is dispositive of his appeal. Nevertheless, since we are addressing Liz's arguments on dissolution, we will also consider the points Ken and Susan raise.

### C.    *Dissolution Under Subdivision (b)(4)*

Involuntary dissolution under subdivision (b)(4) requires a showing that those in control of the corporation have been guilty of, or have knowingly countenanced, either: (1) "persistent and pervasive fraud, mismanagement or abuse of authority"; (2) "persistent unfairness toward any shareholders"; or (3) that the corporation's property "is being misapplied or wasted by its directors or officers." (§ 1800, subd. (b)(4).) This ground for dissolution "is aimed at the misconduct of the controlling shareholders, not the 'reasonable expectations' of the minority shareholders." (*Bauer*, *supra*, 46 Cal.App.4th at p. 1114, citing *Buss v. J.O. Martin Co.* (1966) 241 Cal.App.2d 123, 134–137 (*Buss*).) The general focus of subdivision (b)(4) is on the "dominant stockholder's 'persistent mismanagement,' " which has been defined as "consistently incompetent or unskillful conduct of the business of the corporation over a relatively long period of time, with a tenacious or persistent disregard of opposition or previous failure." (*Bauer*, at p. 1114 & fn. 5; *Buss*, at p. 134.)

50.

Examples of the application of subdivision (b)(4) are found in *Buss* and *Bauer*. In *Buss*, the trial court sustained a demurrer to an involuntary dissolution action the minority shareholders in a family-owned corporation brought against the corporation and majority shareholder. (*Buss*, *supra*, 241 Cal.App.2d at p. 128.) The appellate court reversed, finding the complaint stated a cause of action for dissolution under the predecessor to section 1800, former section 4651, subdivisions (e) and (f).[43] (*Buss*, at p. 134.) The appellate court concluded the complaint alleged "persistent mismanagement" where the controlling shareholder: lost most of the manufacturing agencies and access to products which had been built up over the years; quarreled and wrangled with customers; failed to comply with customers' needs and hold their trade and good will; discharged and lost most of the corporation's competent employees and failed to hire competent persons to carry on its business; and generally managed and directed the corporation " 'as his private affair,' " to the actual financial loss and detriment of minority shareholders. (*Id.* at p. 135.) The appellate court noted that, when read as a whole, these allegations essentially asserted the controlling shareholder continued to manage the corporation "wrongly and incompetently." (*Ibid.*)

The appellate court further found these allegations established a "persistent abuse of authority" and "persistent unfairness toward minority stockholders," especially in light of the allegation that the controlling shareholder managed and conducted the corporation as his private affair. (*Buss*, *supra*, 241 Cal.App.2d at p. 135.) The court noted that, "[o]n this aspect" of the statute, the following allegations added support: the controlling

---

**43** Former section 4651 provided that a court "may entertain proceedings" for the involuntary dissolution of a corporation "when it is shown that any one or more of the following reasons exist: [¶] … [¶] (e) The directors or those in control of the corporation have been guilty of persistent fraud, mismanagement, or abuse of authority, or persistent unfairness toward minority shareholders, or its property is being misapplied, wasted, or lost by its directors or officers. [¶] (f) The liquidation is reasonably necessary for the protection of the rights or interests of any substantial number of the shareholders, or of the complaining shareholders."

shareholder deprived the minority shareholders of access to books and records, paid himself excessive salaries through the corporation, and the actual value of the minority shareholder's investment had deteriorated as a result of his conduct of the business. (*Ibid.*) Finally, the court found these allegations were sufficient to establish that liquidation was " 'reasonably necessary for the protection of the rights or interests … of the complaining shareholders.' " (*Ibid.*)

In *Bauer*, two minority shareholders sought involuntary dissolution of a corporation controlled by the majority shareholder on the grounds of alleged fraud and mismanagement. (*Bauer*, *supra*, 46 Cal.App.4th at pp. 1110–1111.) At trial, the minority shareholders presented evidence the majority shareholder had misused or misappropriated the corporation's real and personal property, and never paid dividends to the other shareholders. (*Id.* at p. 1111.) The trial court found the minority shareholders had not proven they were entitled to dissolution. While the majority shareholder used the corporation's property as his own, the minority shareholders knew about it and used some of the property themselves. There was no evidence the minority shareholders objected to the failure to pay dividends or were denied access to corporate books or records, and the minority shareholders did not expressly complain about the majority's management for more than 15 years. While several unresolved questions remained regarding possible mismanagement or malfeasance, the evidence was insufficient to support involuntary dissolution. (*Id.* at pp. 1111–1112.)

In affirming the trial court's refusal to order dissolution under subdivision (b)(4), the appellate court noted that, unlike *Buss*, the trial court found the minority shareholders failed to demonstrate the majority shareholder engaged in any misconduct against them. (*Bauer*, *supra*, 46 Cal.App.4th at p. 1114.) The circumstances were the opposite of *Buss*, as it was the minority shareholder's mismanagement of the corporation that caused it to suffer serious financial losses, and the corporation performed relatively well when the majority shareholder-controlled operations. (*Bauer*, at p. 1114.) The court noted there

was no evidence the majority shareholder paid himself excessive compensation, none of the shareholders received dividends, and the majority shareholder never barred the minority from membership on the board of directors or denied them access to corporate books or records. (*Id.* at pp. 1114–1115.)

The appellate court rejected the minority shareholders' argument they established " 'persistent unfairness' by demonstrating they were 'squeezed out' " when the majority shareholder excluded them from participating in the conduct of the business and denied them any economic benefits from their ownership interests in the corporation. (*Bauer*, *supra*, 46 Cal.App.4th at p. 1115.) While there was some "indicia of corporate 'squeeze out,' " such as the failure to pay dividends and termination of one of the minority shareholder's employment, the evidence showed: (1) dividends were never paid; (2) the minority shareholder chose not to remain on the board of directors; (3) the same minority shareholder was fired only after he terminated the majority shareholder's employment with a separate family-owned corporation, which continued to employ and compensate the minority shareholder; and (4) the majority shareholder had a legitimate motive for terminating the minority's employment, as he was stealing customers, trade secrets, and corporate good will, while maneuvering to create a new company that would compete with the corporation. (*Ibid.*) Thus, the majority shareholder's actions had the legitimate purpose of protecting the corporation from the minority's attempts to take away its business. (*Ibid.*)

### 1. Liz's Appeal

Liz contends involuntary dissolution is required based on the board's persistent mismanagement and unfairness toward shareholders. She asserts JHBE's history shows that during J.H.'s life, JHBE was run for the sole benefit of J.H. and his trusts, and after J.H.'s death, it was run for the benefit of J.H.'s trusts, at the expense of the other shareholders. Specifically, she points to the following as evidence of this history: the buy-sell agreement; JHBE's acquisition of the $2.5 million loan; the advances to J.H.; the

53.

use of corporate funds to cover J.H.'s personal expenses; the use of corporate funds to pay the legal defense of Martha, Robert, and Louise; and the payment of a salary to Louise. We address each in turn.

### a. The Buy-Sell Agreement

With respect to the buy-sell agreement, the trial court found it was not unfair for the individual defendants to expect the stock transfer rules to be honored by all shareholders or for the board to set the maximum price of the stock. Crediting Robert's testimony concerning the August 2013 board meeting, when the board established the fair market value of the stock, the trial court was persuaded that when the board met on several occasions to establish a maximum fair market value, it exercised care and arrived at good faith estimates of the stock's fair market value. The trial court noted that Ken and Joe approved the $277 maximum share price, and the board unanimously approved the same share price at the May 2014 board meeting.

The trial court rejected the argument that the buy-sell agreement was illusory, as contracts that expressly or impliedly require good faith performance have consistently been held to be enforceable. There was no showing the maximum price the board established ever impeded any shareholder's ability to sell their stock, and appellants failed to prove their stock was unmarketable. The trial court explained the buy-sell agreement and bylaws essentially require a shareholder to locate a buyer that is willing to pay a price acceptable to the seller, and at best, the evidence showed the stock was not marketable at the prices Liz and Ken set, and there was no reason to think the stock would not sell if the prices were lowered.

On appeal, Liz contends the buy-sell agreement is "whimsical and illusory." She asserts the agreement allows the board to set the fair value of stock "on a whim," since the valuation formula does not contain any guidelines or objective criteria, and the board picked the value of the stock "at random," as shown by the fluctuating share values the board set over a two-year period. Liz contends the notice of intended sale sent to the

54.

shareholders offering her shares at $341.07 per share did not comply with the buy-sell agreement because it included information not required by the agreement, namely, the reference to Ken's note coming due. She claims this information was included only to dissuade potential buyers and a statement about her threat of litigation, which also would have affected the share value, was not included even though it would have provided an incentive for the other shareholders to buy her shares.

The buy-sell agreement sets out a formula based on the fair market value of JHBE's assets, as determined by the board, less liabilities and the built-in gains tax. While the agreement does not contain objective criteria for determining the assets' fair market value, the agreement is not illusory because it is constrained by the implied covenant of good faith and fair dealing, which "prevents one contracting party from 'unfairly frustrating the other party's right to receive the benefits of the agreement actually made.' " (*Serpa v. California Surety Investigations, Inc.*(2013) 215 Cal.App.4th 695, 706.) Thus, " 'where a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing.' " (*Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 923; see *Harris v. TAP Worldwide, LLC* (2016) 248 Cal.App.4th 373, 388–389.)

The board, therefore, must exercise good faith and reasonableness in setting the fair market value of the shares. While Liz argues the board picked the share value at random, the trial court found the board exercised good faith in valuing the shares, a finding that is supported by substantial evidence. At the August 2013 board meeting, when the shares first were valued, the board met for four hours, discussed every piece of property JHBE owned and came up with what it collectively believed to be the fair value of the shares—$277 per share. The board affirmed this share price at its May 2014 meeting. The board had a legitimate reason to raise the share price to $341.07 three months later, as it did so to try to stave off Liz's threatened litigation when she demanded

either JHBE or the other shareholders to purchase her shares for more than the $277 share value.

When the board decided not to purchase the shares at that price, it sent a notice of intended sale to the other shareholders. While the buy-sell agreement lists the information the notice of intended sale must include,[44] it does not prohibit the inclusion of additional information. On the advice of counsel, and to satisfy the board's fiduciary obligation to the shareholders, the board advised a significant note, namely, the $2.5 million note, was coming due and if payment was not received, JHBE's stock value would be negatively impacted. The board members denied the information was included to discourage shareholders from buying. The notice did not also advise that Liz had threatened litigation if her shares were not purchased because the attorney did not tell the board that information needed to be disclosed.

When the board reduced the share value to $157 in November 2015, it did so based on K.Coe Isom's professional valuation, which took into consideration Ken's default on the $2.5 million note. Thus, the board had a legitimate reason for reducing the share value. Evidence exists to show the board acted reasonably each time it adopted a new share price.

Liz argues the buy-sell agreement is designed to stop the sale of stock, as she could only sell the shares to a third party on the same terms JHBE rejected. But nothing prevented Liz from reoffering the stock to JHBE at a lower price. As the trial court found, there was no reason to think that if she lowered the price, the stock would not sell, and the arrangement was not inherently unfair.

---

[44]    The buy-sell agreement stated the notice of intended sale "shall include: the number of shares proposed to be sold under each class of stock, the sales price of the shares, the terms of the sale, the Corporation's intent to purchase all or a portion of the shares or waive its right to purchase the shares, and the shares available for Shareholders to purchase after the Corporation exercises its right of first refusal."

### b. Acquisition of the $2.5 Million Note

The trial court found JHBE's acquisition of the $2.5 million note was a sound business decision likely to benefit all shareholders, and was approved by J.H., who was the majority shareholder, as well as Ken and Joe. While the JHB Trust and J.H. benefited from the payoff of the debt the JHB Trust owed JHBE, JHBE benefited from the $271,376.79 discount and the discontinuation of J.H.'s $120,000 per year salary. Ken's guarantee of the note and pledge of his wealth, along with the six percent interest rate on the note, made JHBE's decision to acquire the note a good one. The trial court rejected the claim it was mismanagement to acquire the note, as that would make sense only if the note was uncollectible and known to be so when it was acquired in July 2012. While Ken insisted at trial that he would fully pay the debt, he did not explain why, if he was willing and able to pay, he had chosen not to do so. Thus, the trial court found it hard to credit Ken's inconsistent argument that JHBE's acquisition of the note was a bad decision. Moreover, there was a legitimate corporate purpose in structuring the transaction to benefit J.H. to reward JHBE's founder "whose hard work had created the wealth that all of the shareholders enjoy."

The trial court noted appellants claimed the acquisition of the $2.5 million note was an interested party transaction, which Martha should not have participated in because she had a conflict of interest given she was the JHB Trust's trustee and a JHBE board member. The trial court, however, found all of the family members had impliedly or effectively waived their right to complain about interested party transactions and Martha's alleged conflict of interest, as JHBE had always been owned by, and the board comprised of, Boyd family members. When JHBE acquired the note in July 2012, all of J.H.'s children were shareholders in JHBE and beneficiaries under the JHB Trust. The trial court reasoned the conflict of interest concerns should fall away because everyone had a conflict of interest in connection with the transaction. Even assuming it was an

57.

interested party transaction, the individual defendants met their burden of proving the transaction was inherently fair.

Finally, the trial court found the individual defendants exercised due diligence in connection with the transaction. Specifically, both directly, through Louise, and indirectly, through Joe, they sought and obtained Ken's assurances that he could and would repay the loan if JHBE acquired it. The trial court determined this was all the due diligence that was required. In addition, the trial court found that in performing their duties as directors, the individual defendants acted in good faith and in a manner consistent with the best interests of JHBE and its shareholders, and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances.

On appeal, Liz contends JHBE's acquisition of the $2.5 million note was mismanagement. Liz claims the transaction violated section 310. She asserts the trial court failed to address the conflicts of interest inherent in the transaction, and ignored the standards of section 310 and the lack of reasonable inquiry before undertaking the transaction. She argues the trial court essentially concluded the interested parties could violate the law because they acted in good faith. Liz claims the business judgment rule of section 309 does not protect the board because it did not perform any due diligence before the transfer agreement was drafted and signed.

The business judgment rule has two components. The first component, codified in section 309, immunizes directors from personal liability if they act in accordance with certain conditions, while the second component shields from court intervention those management decisions made by corporate directors in good faith and in what the directors believe is in the corporation's best interest. (*Berg & Berg Enterprises, LLC v. Boyle* (2009) 178 Cal.App.4th 1020, 1045.) At issue here is the first component, section 309, which provides that a director must perform his or her duties "in good faith, in a manner such director believes to be in the best interests of the corporation and its

58.

shareholders and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances." (§ 309, subd. (a).)  A director is insulated from liability if he or she performs those obligations in the manner provided in the statute.  (§ 309, subd. (c); *Bader v. Anderson* (2009) 179 Cal.App.4th 775, 788.)  Under the business judgment rule, a director's liability must be based on no less than gross negligence.  (*Katz v. Chevron Corp.* (1994) 22 Cal.App.4th 1352, 1366.)

Apart from the business judgment rule, majority shareholders and directors owe fiduciary duties to minority shareholders in the exercise of corporate powers.  (*Jones v. H.F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 108.)  "[M]ajority shareholders, either singly or acting in concert to accomplish a joint purpose, have a fiduciary responsibility to the minority and to the corporation to use their ability to control the corporation in a fair, just, and equitable manner.  Majority shareholders may not use their power to control corporate activities to benefit themselves alone or in a manner detrimental to the minority.  Any use to which they put the corporation or their power to control the corporation must benefit all shareholders proportionately and must not conflict with the proper conduct of the corporation's business."  (*Ibid.*)  This is a comprehensive rule of " 'inherent fairness from the viewpoint of the corporation and those interested therein.' " (*Id.* at p. 110.)

Liz contends the business judgment rule does not apply because the transaction was not in JHBE's best interest and the board did not make a reasonable inquiry concerning the transaction.  Liz, however, ignores the evidence that supports the trial court's findings.  This was not a situation where the board did nothing—Joe performed a cash flow analysis, and both he and Louise spoke with Ken, who assured them he was worth $18 million and the loan would be paid on time.  In addition, the board knew Ken and Susan signed personal guarantees.  While there is no evidence Martha, Louise, or Joe personally examined the note or deed of trust, under the circumstances it was reasonable for them to rely on Ken's assurances in deciding to enter into the transaction.

59.

As for corporate benefit from the transaction, JHBE acquired the $2.5 million note by issuing a $1.5 million note to JHB Trust, forgoing immediate payment of JHB Trust's $813,908 debt, and receiving a $271,000 discount. This meant that in two years, when the $2.5 million note was due, JHBE stood to receive the $271,000 discount, the $813,908 debt, and six percent interest on the note. While JHBE was making $20,000 monthly payments on the $1.5 million note, it stopped paying J.H.'s salary of $10,000 per month. Thus, JHBE's outgoing cash flow increased by $10,000. Liz asserts the outgoing payments took away some of JHBE's flexibility should it need cash in the future, but Joe performed a cash flow analysis and determined there would not be a cash flow problem. The board unanimously agreed to purchase the note after concluding it was a good investment. As Ken stated in March 2014, the loan was an interest-earning investment that increased JHBE's bottom line by over $900,000. While J.H.'s estate planning was the impetus for the transaction and J.H. received a personal benefit from the transaction, that does not negate the benefits to JHBE.

The entire transaction depended on one thing—Ken's prompt payment of the $2.5 million note. Although JHBE assumed all the risks of collecting the note and committed to paying the $1.5 million note to the JHB Trust, even if Ken did not pay, the board reasonably relied on Ken's assurances that he would pay on time, especially in light of his personal guarantee and pledge of his considerable wealth.

Liz also contends the transaction violated section 310. "Section 310 governs situations where a matter before a board of directors is one in which a director has an interest." (*Sammis v. Stafford* (1996) 48 Cal.App.4th 1935, 1941.) As pertinent here, section 310, subdivision (a), provides that a transaction between a corporation and a corporation or other entity in which a director has a material financial interest, is neither void nor voidable, even though the interested director is present when the transaction is approved or ratified, if: (1) the material facts of the transaction and the director's interest are fully disclosed or known, and the transaction is approved by the disinterested

60.

shareholders in good faith (§ 310, subd. (a)(1)); (2) the material facts of the transaction and the director's interest are fully disclosed or known, the transaction is approved or ratified by the disinterested directors in good faith, and the transaction is just and reasonable to the corporation at the time (§ 310, subd. (a)(2)); or (3) as to transactions not approved as provided in the prior paragraphs, the person asserting the transaction's validity sustained the burden of proving the "transaction was just and reasonable as to the corporation at the time it was authorized, approved or ratified" (§ 310, subd. (a)(3)). The burden of proving the transaction was not just and reasonable under section 300, subdivision (a)(2), is on the party challenging the transaction. (*Sammis v. Stafford*, at p. 1943.)

Liz contends Martha, as trustee of the JHB Trust, had a material financial interest in the transaction, and therefore she should not have participated in the decision. The board members, however, knew she was trustee of the JHB Trust. They also were aware of the material facts of the transaction, as they all participated in the decision and signed the written consent that set forth its terms. Liz points out that not all the board members were aware of the simultaneous changes to the JHB Trust or the establishment of the JHB Irrevocable Trust. But the JHB Irrevocable Trust was not involved in this transaction and the changes to the JHB Trust affected only Ken's ability to receive his inheritance—there was no change to the other beneficiaries other than their right to receive Ken's share of the trust assets should he fail to repay his debts. This information was not required for the board to decide whether to purchase the $2.5 million note. The board acted in good faith in approving the transaction and, as set forth above, the transaction was just and reasonable to JHBE at the time. Even though Martha participated in the vote, since the vote was unanimous, there were sufficient votes of the other board members to approve the transaction. There was no violation of section 310.

### c. *The Loans to J.H.*

Section 315, subdivision (a), prohibits a corporation from loaning money or property to any corporate director or officer unless the transaction "is approved by a majority of the shareholders entitled to act thereon." Directors who approve of making loans in violation of section 315 may be held personally liable for the loan amounts. (§ 316, subd. (a)(3).) An action to recover the loan amounts must be brought within three years after the aggrieved party discovers the facts. (Code Civ. Proc., § 359.)

The trial court found that complaints concerning noncompliance with section 315 with respect to the loans J.H. took from JHBE were barred by laches or the statute of limitations, or were waived or excused. Loans were made to J.H. for decades without any board member or shareholder complaining and, in any event, they were paid off as part of the $2.5 million note acquisition, except for the $1.5 million loan JHBE owed the JHB Trust, which effectively was a loan modification of an existing debt. The trial court noted that neither Ken nor Liz asserted in a timely pleading that the $1.5 million debt was wrongful, or resulted from malfeasance or mismanagement.

Liz asserts the loans to J.H. served no corporate purpose, were never presented to the shareholders or approved by them, and were never subject to review or advance approval. Liz notes that while Martha identified JHBE's receipt of interest on the loans as a corporate benefit, there were no promissory notes or other documents to support the advances, other than book entries, and no collateral was sought or obtained. Liz argues the trial court ignored that J.H. received over $1 million in cash from JHBE for his benefit, without any other shareholder benefiting.

Despite the apparent noncompliance with section 315, there is no evidence JHBE was damaged as a result. The evidence showed J.H. paid market rate interest on the loans and always paid them back. The board members were aware of the loans yet did not complain about them. Moreover, J.H. ceased borrowing money after the transaction concerning the $2.5 million note in 2012; thereafter, no other board member borrowed

money from JHBE.  Since there is no indication any board member will borrow money without complying with section 315, the fact that J.H. borrowed money in violation of section 315 does not show persistent mismanagement or unfairness sufficient to justify dissolution of JHBE.

### d.  J.H.'s Personal Expenses

The trial court found there was insufficient evidence the individual defendants caused JHBE to pay for J.H.'s caregivers.  The evidence showed Ken arranged for JHBE to pay one of J.H.'s caregivers, but after J.H. was hospitalized following a fall in early 2013, Martha assumed direct responsibility for his care.  From that time through J.H.'s death, J.H.'s caregivers were paid from J.H.'s own funds, not through JHBE.  Moreover, even if JHBE paid for J.H.'s caregivers, arguably this was an appropriate employee benefit, rather than a discriminatory shareholder distribution.

Liz contends there was no corporate purpose for paying the caregivers.  But the evidence supports the trial court's findings that while JHBE paid for J.H.'s caregiver from 2009 to 2013, once Martha assumed responsibility for J.H.'s care in 2013, she stopped paying the caregivers using corporate funds and instead used his own funds.  Moreover, Martha consulted with the CPA, who advised her JHBE did not need to be reimbursed for the prior payments because they were considered a benefit to a senior officer.  Thus, contrary to Liz's assertion, the payments did have a corporate purpose.  And since the payments ended in 2013, and therefore will not continue, they do not show persistent mismanagement or unfairness.

### e.  Payment of Litigation Expenses

"Section 317 gives a corporation the authority, and in some instances imposes an obligation upon the corporation, to indemnify a person 'who was or is a party or is threatened to be made a party' to any legal proceeding 'by reason of the fact that the person is or was an agent of the corporation[.]' "  (*Channel Lumber Co., Inc. v. Porter Simon* (2000) 78 Cal.App.4th 1222, 1226; § 317, subd. (b).)  Section 317, subdivision (c),

"establishes corporate authority to indemnify an agent who is made or threatened to be made a party to an action by or in the right of the corporation, while subdivision (d) makes indemnification obligatory when the agent successfully defends such a proceeding on the merits." (*Channel Lumber Co., Inc. v. Porter Simon*, at p. 1226.)

After appellants filed suit, lawyers advised JHBE's board it was appropriate for JHBE to advance funds to the individual board members for payment of attorney fees incurred in defending the suits. Based on that advice, the board voted to indemnify Martha, Louise, and Robert, and JHBE advanced fees for their defense. Sometime thereafter, Martha learned the advice given was incorrect for shareholder derivative claims. Thereafter, the individual defendants got a $5,000 bond to cover expenses that were paid out. In addition, Martha became aware steps were taken to obtain a stipulation for a $250,000 bond. After the stipulation and court order were obtained, Martha and Robert undertook steps to obtain the bond and learned they would need to put up all of the bond amount in cash, plus pay fees. Rather than pay the cash and fees, Martha and Robert paid JHBE $200,000 in cash to cover all the expenses from the derivative claims.

The trial court found that while the individual defendants arguably violated section 317 when they caused JHBE to advance litigation expenses incurred in defending appellants' shareholder derivative claims, Martha and Louise did so based on their mistaken reliance on advice of counsel, which was conveyed to Robert, Alice and Christine, who also relied on it. Moreover, the individual defendants and JHBE cured the violation when Martha and Robert repaid JHBE $200,000, which more than compensated for the advances relating to the defense of the shareholder derivative claims. In addition, the individual defendants filed a $5,000 bond consistent with section 317, subdivision (f),[45] which exceeded the advances made to defend the shareholder

---

[45]    Section 317, subdivision (f) provides: "Expenses incurred in defending any proceeding may be advanced by the corporation prior to the final disposition of the proceeding upon receipt of an undertaking by or on behalf of the agent to repay that amount if it shall be determined ultimately that the agent is not entitled to be indemnified

derivative claims after the May 26, 2016 board meeting. The trial court found that because the individual defendants took adequate measures to protect JHBE from any financial harm resulting from the advances of litigation expenses, their posting of a $5,000 bond instead of the $250,000 bond mentioned in the stipulated court order did not establish liability for any of appellants' claims or warrant involuntary dissolution of JHBE.

On appeal, Liz asserts "[t]he trial court seemed undisturbed by this blatant violation of a court order," and it shows "the continuing problems here with the management of the corporation by individuals who have no knowledge or respect for their fiduciary or other duties." The evidence showed, however, that the advance of litigation expenses was nothing more than a good faith mistake the board members made based on advice of counsel and, as soon as the board was made aware of the mistake, JHBE was completely reimbursed in cash. Since JHBE suffered no damage, the trial court reasonably could find that the failure to comply with the stipulated order did not warrant dissolution of JHBE.

### f. Louise's Salary

Louise, who became JHBE's vice president in 1991, was paid a salary from 1992 through 2010 for duties she performed for JHBE. Liz asserts Louise was paid a salary for a personal reason—to obtain enough quarters to qualify for social security benefits—and no other shareholder, except J.H., was provided a similar opportunity. This is pure speculation on Liz's part. No evidence was presented regarding how much Louise was paid or that she did not earn whatever she was paid. Moreover, no evidence was presented that she *was* paid solely to qualify for social security benefits.

---

as authorized in this section. The provisions of subdivision (a) of Section 315 do not apply to advances made pursuant to this subdivision."

### g. Conclusion

Looking at the course of conduct, as set out by Liz, the evidence does not establish JHBE was managed wrongly or incompetently, and therefore Liz has not shown there was persistent mismanagement as a matter of law.[46] Liz contends the evidence establishes persistent unfairness toward the shareholders. But as we have discussed, the evidence supports the trial court's finding that there was no persistent unfairness toward any of the shareholders. There was evidence to show the buy-sell agreement was not unfair or illusory, the board used good faith in setting the maximum share price, and the stock is marketable if sold at the right price. Moreover, there was evidence the board did not violate section 310 or their fiduciary duties when JHBE acquired the $2.5 million note. While J.H.'s loans apparently violated section 315, he paid interest on them and the loans ended in 2012. JHBE stopped paying J.H.'s caregiving expenses in 2013 and the litigation expenses were repaid.

Liz's argument that the board acted unfairly toward the shareholders is, at best, an argument that we should reweigh the evidence, which, of course, is not within our province. (*Citizens Business Bank v Gevorgian* (2013) 218 Cal.App.4th 602, 613 [appellate court may not reweigh or resolve conflicts in the evidence, or redetermine the credibility of witnesses].) Liz has not shown that the trial court erred in declining to dissolve JHBE pursuant to subdivision (b)(4).

### 2. Ken and Susan's Appeal

Ken and Susan contend dissolution was warranted under subdivision (b)(4) based on persistent mismanagement. They list the following as examples of mismanagement:

---

[46] Liz asserts there are other examples that JHBE did what J.H. wanted without regard to the effect on the other shareholders, citing generally to the statement of decision. But Liz does not separately address these examples, so we shall disregard them. (*Tilbury Constructors, Inc. v. State Comp. Ins. Fund* (2006) 137 Cal.App.4th 466, 482 [an argument raised in perfunctory fashion, that is not properly briefed and is without adequate legal analysis, is forfeited].)

(1) Martha organized the sale of the Vineland property for 10 percent of its actual value; (2) the board failed to keep the loan secured by the El Mar Apartments in good standing, thereby jeopardizing its loss through foreclosure; (3) Martha "secretly orchestrated" the acquisition of the $2.5 million note, not to benefit JHBE, but to extinguish the JHB Trust's debt and provide monthly income to J.H.; (4) the board "grossly mismanaged JHBE's farms so as to lose any profit they might have gained" from them; (5) Martha mismanaged the payoff of the Sran note, resulting in increased taxes and expenses; and (6) Martha manages JHBE as president and chairman of the board while living on the east coast.

Ken and Susan assert that under Martha's direction, JHBE's economic performance was well below that expected for a conservatively operated company, and "[b]ecause the current officers, directors and controlling shareholder group have total control of JHBE, there is no prospect that there will be a change in management style or their core competence." They complain the minority shareholders therefore are burdened with a zero-growth potential, since the current management cannot deliver a return on investment that exceeds the inflation rate.

The trial court, however, rejected all of these claims of mismanagement. Instead, the court found: (1) the sale of the Vineland property for $12,000 did not "shock the conscience," since Ken believed it was worth $7,000 only 16 months earlier, and the sale was a "defensible management decision" based on the dilapidated condition of the house, which required it to be razed, the lack of a usable well, and the buyer's agreement to absorb all closing costs and make his water supply available to JHBE; (2) while J.H. personally benefited from JHBE's acquisition of the $2.5 million note, JHBE also benefited from the transaction; (3) the farms were properly cared for by Dennis Wilt and the current lessee; (4) Martha had legitimate reasons to reject Ken's proposed loan to Sran and she persuasively testified her decision, which J.H. ratified, was based on a legitimate concern about preserving liquidity and wanting to avoid becoming top heavy

with loans; and (5) Martha was not an absentee president, but rather was a very engaged one and able to manage JHBE's business affairs even while residing in Maryland.

The trial court found Martha's written analysis of JHBE's recent financial performance confirmed the profitability of the apartments and the industrial and commercial properties since she became president in June 2014.[47] The trial court determined the drag on JHBE's overall performance was "demonstrably attributable to the farming operations," but management was not to blame for the diminished productivity and profitability of the farms. Instead, the declines were attributable to circumstances beyond management's control, namely, the drought and the decline in raisin prices in 2016. While it was suggested the grapes should have been removed and replaced with almonds, management's decision not to do so fell well within the bounds of good business judgment. Finally, the evidence showed the Wells Fargo loan secured by the El Mar Apartments was not in danger of foreclosure and JHBE was current on it payments.

Ken and Susan rely heavily on their limited version of the facts in arguing there was persistent mismanagement. But they neglected to mention facts, which are included in the factual summary above, that support the trial court's decision that no mismanagement occurred. In making conclusory statements that the board's and Martha's actions constituted mismanagement, Ken essentially is asking us to reweigh the evidence, which we cannot do. Moreover, the existence of evidence contrary to Ken's assertions means that he cannot show persistent mismanagement as a matter of law. Thus, the trial court did not err in declining to order dissolution due to persistent mismanagement.

---

[47] Martha's analysis, which was entered into evidence as exhibit No. 274, is not in the appellate record, as the parties failed to include it in their appellate appendices.

## D. *Dissolution Under Subdivision (b)(5)*

The grounds for involuntary dissolution under subdivision (b)(5) are considerably broader than those in subdivision (b)(4). (*Bauer*, *supra*, 46 Cal.App.4th at p. 1116.) Subdivision (b)(5) permits involuntary liquidation of a corporation whenever "*reasonably necessary* for the protection of the rights or interests of the complaining shareholder or shareholders." (Italics added.)[48] This subdivision is not limited to situations of the kind specified in the other subdivisions, but when read with the statute which allows a majority to preserve the corporation by buying out the minority, shows an intent "to empower the courts to order dissolution when required to assure fairness to minority shareholders and at the same time to lessen the danger of minority abuse." (*Stumpf*, *supra*, 47 Cal.App.3d at p. 234.)[49]

The power of minority shareholders to obtain involuntary dissolution is not unlimited: "[T]he danger of minority abuse was evidently recognized and dealt with by the Legislature. The procedure created by the statute does not authorize dissolution at will. The minority must persuade the court that fairness requires drastic relief under [former] section 4651, subdivision (f); involuntary dissolution is not an automatic remedy but, rather, a matter for the court's discretion. '[A] minority stockholder suing under a

---

[48]     The Legislative Committee comment to section 1800 specifically addresses involuntary dissolution in a close corporation: "The new law specifically authorizes the formation of 'close corporations' and the agreements necessary to 'close' the corporation. To provide close corporation shareholders with a remedy, this section permits any shareholder of a close corporation to initiate involuntary dissolution…. [¶] Since this section permits a going concern to be involuntarily terminated, the application of such a drastic remedy should be appropriately limited. Subdivision (b)(5) of this section states a relatively broad ground for involuntary dissolution proceedings and, in light of the expansion of authority to bring such an action, this provision is limited to corporations with 35 or fewer shareholders." (Assem. Legis. Com. com., reprinted at 23E West's Ann. Corp. Code (2015 ed.) foll. § 1800.)

[49]     *Stumpf* was decided under former section 4651, subdivision (f). (*Stumpf*, *supra*, 47 Cal.App.3d at p. 233, fn. 2.)

statute, just as if he were suing in the absence of statute, must still convince the court that his application is meritorious.' " (*Stumpf, supra*, 47 Cal.App.3d at p. 235.)

In *Stumpf*, the trial court granted a son's request for involuntary dissolution, under the predecessor to subdivision (b)(5), of a corporation that was wholly owned by himself, his father, and his brother. After a managerial dispute, the son ceased to be employed by the corporation, he was removed as a corporate officer, and thereafter he did not participate in the family business, and was not asked to do so. (*Stumpf, supra*, 47 Cal.App.3d at p. 232.) The corporation had never paid dividends, but instead invested profits in the corporation's rental properties. The trial court found that after the son stopped being active in the business, his father and brother had not committed any abuse of authority or displayed persistent unfairness toward him. (*Id.* at p. 233.) Despite the absence of misconduct or bad faith, the appellate court upheld the trial court's "exercise of discretion to order dissolution" based on evidence that the hostility between the son and his brother had grown so extreme it caused the son to sever contact with the family and he was allowed no say in the business' operation, and thereafter, the son "received no salary, dividends, or other revenue from his investment in the corporation." (*Id.* at p. 235.)

In *Bauer*, the appellate court concluded the trial court did not abuse its discretion in finding the "drastic relief of involuntary liquidation" was not " 'reasonably necessary' " to protect the minority shareholders' interests in light of their bad faith conduct in setting up a competing business and soliciting the corporation's customers. (*Bauer, supra*, 46 Cal.App.4th at p. 1117.) Aside from the minority shareholders' bad faith, the nonpayment of corporate dividends was not a basis for granting dissolution because there were no profits from which dividends could be paid; therefore, the minority shareholders did not have a reasonable expectation of receiving dividends. (*Ibid.*) Moreover, the minority shareholders had no actual expectation of receiving dividends or

70.

continued earnings, as they had provided alternative sources of income and benefits for themselves before the minority shareholders' firing. (*Id.* at p. 1118.)

Finally, in *Stuparich*, two sisters sought involuntary dissolution under subdivision (b)(5) of a family-owned corporation, which was run by their brother (the majority shareholder). The sisters, who had been paid significant dividends over the years, had no role or power in the corporation, and their brother refused to buy out their shares. They stopped attending annual meetings after realizing they had no voice in the corporation's operations. (*Stuparich*, *supra*, 83 Cal.App.4th at pp. 1270–1272.) The trial court granted the corporation's summary judgment motion, finding the sisters had not raised a triable issue of material fact " 'as to whether liquidation is reasonably necessary to protect plaintiffs' rights and interests,' " because the sisters could pursue a representative on the board of directors to represent their interests in the corporation and their rights were not in need of protection as they consistently received dividends. (*Id.* at p. 1273.)

The appellate court affirmed. While the brother had voting control of the corporation, the distribution of voting shares was consistent with California law and did not, "in itself, present a 'reasonable' necessity for dissolution." (*Stuparich*, *supra*, 83 Cal.App.4th at p. 1277.) The court noted there was no evidence the brother engaged in bad faith conduct that rose to the level demonstrated in *Bauer*, and the situation presented was not unique to "this close corporation." (*Stuparich*, at p. 1278.) As holders of a minority of voting shares, the sisters were not entitled to substitute their business judgment for their brother's with respect to viability of one aspect of the corporation's operations. (*Id.* at p. 1279.) The court found *Stumpf* distinguishable, as the sisters continued to receive dividends until the litigation was instituted, and while there was extreme family hostility, it was the sisters who removed themselves from participation in the board meetings. (*Stuparich*, at p. 1279.) Finally, the court rejected the sisters' argument the trial court "ignored the 'safety valve' provisions of section 2000, which allow a corporation or majority shareholder to avoid involuntary dissolution by buying

out the minority shareholders," as the provision is not mandatory and does not require the board of directors or majority shareholders to buy the minority's shares to avoid dissolution. (*Ibid.*)

Here, the trial court found involuntary dissolution was not necessary to protect the rights and interests of the complaining shareholders, as there were sufficient safeguards to protect appellants' rights or interests, and the board members had not "dishonored or impaired" any of their rights. Specifically, the trial court found appellants did not have the right to have JHBE buy their shares under the bylaws or the buy-sell agreement, or the right to sell the shares other than at a price they were able to persuade a willing buyer to pay. With respect to Liz's claim of a right to request records, the trial court found it was not reasonable to request the immediate supply of voluminous records while management was preoccupied with the defense of this lawsuit, noting that historically, JHBE had honored Liz's document requests.

### 1. Liz's Appeal

Liz asserts the purpose of subdivision (b)(5) is to protect a complaining shareholder's economic rights or interests where no other remedy is available, and argues this case presents the precise situation that calls for the application of subdivision (b)(5). She claims she has received zero economic benefits from JHBE as shown by the following: she is trapped because, as a minority shareholder, she has no leverage to force action; there is no ready market for her shares, as only J.H.'s lineal descendants are supposed to hold them; she has no way of securing employment with JHBE; JHBE does not issue dividends and refused to loan her money; and the board controls the share price and manner of sale. Moreover, because Martha, Robert and Louise own enough stock to control the corporation, they can elect to ensure dividends are not paid and stock is not sold at JHBE's true value. Liz asserts the majority shareholders have taken every step to ensure she cannot extricate herself from JHBE while failing to provide her any economic

benefit as a shareholder.  Liz claims that unless she can compel dissolution, she has no way to realize the value of her stock ownership.

The trial court did not abuse its discretion in denying dissolution under subdivision (b)(5).  Although Martha, Robert and Louise, together, own enough shares to outvote Liz and Ken on any issue, the trial court found that, at all times, they acted in good faith and in the best interests of JHBE and its shareholders.  The board used good faith in setting the maximum share price.  The evidence shows there is a mechanism in the buy-sell agreement for Liz to sell her shares, but instead of utilizing that mechanism, she chose to market the shares at an unrealistic price and took the position she was not bound by the buy-sell agreement.  The board offered to purchase 73 of Liz's Class A shares at the maximum share price of $277 set by the board and, if Ken paid off the $2.5 million note in three months, would consider purchasing the remainder of her Class A shares.

We agree with respondents that it is reasonable to infer that had Ken timely paid the loan, JHBE would have purchased all of Liz's Class A shares at $277 per share.  Liz, however, insisted on receiving $341 per share and threatened litigation if her demand was not met.  No one wanted to purchase her shares at the inflated price, and the board would have breached its fiduciary duty had it purchased the shares for more than they were worth.  There is a market for Liz's shares if they are sold at the right price, but there is no evidence she offered or tried to sell her shares at a fair market price.

As for dividends, JHBE historically did not pay them and there is no evidence anyone complained.  JHBE began paying dividends in 2012 and 2013, and there is nothing to suggest Joe did not receive his pro rata share.  As Martha testified, the board intended to continue paying them, but it stopped in 2014 due to this litigation.

Based on the above, the trial court reasonably could conclude that dissolution was unnecessary to protect Liz's rights or interests.  While Liz complains she has no leverage as a minority shareholder, that in itself is insufficient to warrant dissolution, as that is the

73.

case for all minority shareholders. The issue is whether the majority shareholders abused their positions to deprive Liz her rights or interests in JHBE. The trial court determined they did not. That finding is supported by the evidence. Although Liz asserts JHBE or the majority shareholders could have avoided involuntary dissolution by buying her out as provided in section 2000, the statute is not mandatory and there is nothing in its language "which requires either the board of directors or the majority shareholders to buy the shares of the minority to avoid dissolution." (*Stuparich*, *supra*, 83 Cal.App.4th at p. 1279.) Accordingly, the trial court did not abuse its discretion in refusing to order dissolution under subdivision (b)(5).

### 2. Ken and Susan's Appeal

Ken and Susan's argument for dissolution is a little different than Liz's. They assert that in establishing JHBE, J.H intended the stock distributed to his children and grandchildren to have liquidity. They argue Martha has embarked on a program that is much different than what J.H. intended, as she has taken every opportunity to suppress the stock's value, and refused to make loans or repurchase stock at fair market value. Ken and Susan claim it would have been a simple transaction to allow Ken to exchange his stock to pay down his debt, but the board summarily refused his request and also refused to allow his children to sell their stock to him, thereby making the stock practically valueless, since no buyers can be found. They further assert Martha and Louise thwarted Joe's and Liz's attempts to sell or leverage their stock. He claims these actions demonstrate a suppression of the value and liquidity of the minority shareholders' stock.

Ken and Susan argue dissolution is required under subdivision (b)(5) because: (1) Ken and Liz receive no financial gain from their stock, as they cannot sell it, they receive no dividends or salary, and the controlling board members have systematically kept them from receiving any financial benefit; (2) there is extreme hostility between the parties; (3) Ken and Liz cannot sit on the board together, and while Liz gained a seat on

the board, she was excluded from all major decisions and information was hidden from her; and (4) Martha engaged in bad faith conduct by abusing her positions as trustee of the JHB Trust and president of JHBE to unduly influence J.H. and enrich herself, as shown by the amendments to the JHB Trust and establishment of the JHB Irrevocable Trust.

Breakdowns in family relationships and hostility between majority and minority shareholders, however, are insufficient in themselves to justify involuntary dissolution. As we discussed above, the board members acted in good faith and the shares were marketable if the price corresponded with their fair market value. The board was not required to allow Ken to use his shares to offset his debt to JHBE, and in rejecting his offer, Martha directed him to the procedures in the by-laws for selling his shares, but Ken never attempted to sell them.

In making their argument, Ken and Susan ignore the trial court's factual findings. The trial court found JHBE did not unfairly reject Ken's effort to purchase his children's stock at $550 per share, as the effort remained dormant for nearly five months, and Ken and his family only displayed a renewed interest in the proposed sale when JHBE's summary judgment motion was on the verge of being granted. By purchasing his children's stock at an inflated price, Ken effectively was attempting to divest himself of his wealth so he could shield his assets from JHBE's possible levy. The trial court noted Ken declined to purchase Liz's stock at $341 per share the prior year, which supported the conclusion the $550 per share price was inflated and inconsistent with the true fair market value.

Although Ken and Susan assert Martha acted in bad faith by unduly influencing J.H., the trial court rejected that claim. Instead, the trial court found that neither Martha nor any other individual defendant unduly influenced J.H. or imposed their will on him, and from JHBE's beginning until Martha became president in June 2014, the decisions he made for JHBE and his trust were his own.

Ken and Susan complain that it was Martha's actions that suppressed JHBE's stock value, but they dismiss Ken's role in JHBE's financial struggles and his own bad faith conduct in failing to pay the $2.5 million note. As we explained when discussing Ken's unclean hands, Ken admitted he owed $2.5 million to JHBE on the note and he had the means to pay the debt, yet he refused to do so. It was Ken's failure to pay the note that lead to JHBE's problems. Instead of honoring his obligation and assisting JHBE, he litigated the repayment issue at every turn and attempted to dissolve JHBE based, in part, on JHBE's poor financial condition, to which his failure to pay the note contributed.

On these facts, the trial court did not abuse its discretion in determining that dissolution was not necessary to protect Ken's rights or interests, as allowing him to use subdivision (b)(5) as a coercive tool to force an involuntary dissolution would be "tantamount to sanctioning abuse" by a minority shareholder who was acting in bad faith. (*Bauer*, *supra*, 46 Cal.App.4th at p. 1117.)

## DISPOSITION

Respondents' motion to dismiss Ken and Susan's appeal is denied. The November 16, 2017 judgment and February 14, 2018 order are affirmed. Costs on appeal are awarded to respondents.


DE SANTOS, J.

WE CONCUR:


PEÑA, Acting P.J.


SMITH, J.


76.